THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. EUGENE HAYMER *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 85—3403

Opinion filed April 7, 1987.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Peter D. Fischer, and Kay M. Ceresa, Assistant State's Attorneys, of counsel), for the People.

Neville, Pappas & Mahoney, of Chicago (Ronald F. Neville, of counsel), for appellees.

JUSTICE STAMOS delivered the opinion of the court:

Plaintiff-appellant, the People of the State of Illinois (State), appeal from the circuit court's order granting defendants-appellees', Eugene Haymer (Haymer) and Michael McCoy (McCoy), motions to suppress inculpatory statements. The State appeals alleging that the circuit court erred in ruling that: (1) Haymer and McCoy's statements to police were involuntarily given and (2) Haymer's arrest was not based on probable cause.

The record reflects the following. On July 20, 1984, Jesse Robinson was shot at 3250 South Lake Shore Drive. Detective Jean Romic testified that she was assigned to investigate the shooting. One or two days after the shooting, Romic interviewed Officer Linzay of the Chicago police department. He stated that he was on patrol in the area of the shooting when he was stopped by a female in a car asking directions to a hospital because a man in her car had been shot. Officer Linzay told Romic that he spoke with Sammy Brown, an eyewitness to the shooting. Brown told Officer Linzay that he had observed two or three black males, who had done the shooting, get into a car. Brown's girlfriend had recorded the license number, which was found to be registered to defendant Haymer of 3519 South Federal, apartment 301. Romic was unsuccessful in locating the vehicle.

On July 23 or 24, Romic learned that Haymer was interviewed at Area One Headquarters by Detective Morrissey on July 22, 1984. Haymer told Morrissey that he was at the lakefront on the evening of the shooting with his girlfriend, Gloria Shanklin. Haymer stated that they had heard shots and left because they didn't want to become involved. Morrissey then spoke to Gloria Shanklin, who corroborated Haymer's statement.

The victim, Jesse Robinson, remained in a coma until his death on October 2, 1984. On October 4 Romic and her partner, Detective Habiak, were assigned to follow up on the July 20, 1984, shooting incident. They went to 3519 South Federal and found a vehicle described by Sammy Brown and registered to Haymer. Haymer observed the officers examining his car and came out to speak to them. The two officers informed Haymer that the investigation concerning the shooting was still pending and that the victim, Jesse Robinson, had died. Haymer agreed to go to Area One Violent Crimes Headquarters. At Area One Haymer was taken to an interview room on the second floor. Habiak read him his *Miranda* rights. Haymer repeated the same version of events that he had previously given to the police on July 22, 1984. Haymer agreed to take a polygraph examination. The examination took place at 11th and State at 9 p.m. The examiner told Romic that

Haymer had lied regarding the shooting incident. The officers took Haymer to Area One and placed him in an interview room while they endeavored to find Sammy Brown and Gloria Shanklin.

At about 2:30 or 3:30 a.m. on October 5, Romic and Habiak informed Haymer that the polygraph examiner said that he was lying and that they could not find Gloria Shanklin. The officers asked Haymer if he wanted to change his story and he replied he did not. Haymer was then placed under arrest and taken to the lockup. Detectives Romic and Habiak returned to work at 4:30 p.m. on October 5. The officers found Gloria Shanklin and brought her to Area One. She repeated that she and Haymer were down on the lakefront when they heard shots and ran away. She agreed to take a lie detector test. As Romic was making the arrangements for the test, Shanklin told Habiak that she had not been telling the truth regarding the shooting incident. She said that she was not at the lakefront with Haymer that night; that Haymer had called her up and asked her to lie for him; that she agreed when he swore that he had not shot anyone.

Between 7:30 and 7:45 p.m. on October 5, 1984, Romic and Habiak again interviewed Haymer. The officers advised him of his *Miranda* rights and related what Shanklin had told them. Haymer then told the officers that he wanted to tell them what really happened. Romic testified that Haymer told the officers that he had gone up to the lake with two of his friends, Michael McCoy and Darrell Ivory, to drink and get high. Haymer said that Ivory walked from the car to go to the bathroom. He saw Ivory approach another car and say something to an elderly man in the car; then Ivory shot the old man. Ivory returned to the car and they left the scene. After Haymer gave the officers this statement, the officers returned Haymer to the lockup. At 2 a.m. on December 6, Romic and Habiak consulted with Assistant State's Attorney Grinbarg regarding charging Haymer. After telling Grinbarg all the information they knew regarding the case, Grinbarg advised the officers that the State's Attorney's office would not approve charges unless the police found McCoy or Ivory to dispute or verify Haymer's statement. Habiak then requested that the prisoner be held past the court call in order to allow the police more time to investigate. Haymer was not, in fact, brought before a judge. He was released at 11:30 p.m. on October 6, 1984. Officer Romic placed all the information regarding the shooting that she had into a police report and the investigation was turned over to other detectives.

On October 8, 1984, Detective Henry Singler arranged to meet with Haymer and McCoy at 35th and Federal. Between 12 and 12:30,

Singler and Detective Michael J. O'Connor met defendants and they agreed to accompany the officers to Area One Headquarters for questioning. Neither defendant was arrested or handcuffed but were put in interview rooms at Area One. Prior to interviewing McCoy, Singler read him his *Miranda* rights. O'Connor had a conversation with Haymer after reading him his *Miranda* rights. After talking to McCoy, Singler summoned Assistant State's Attorney Norma Reyes, who arrived at Area One, Violent Crimes, at 2 p.m. to interview the two witnesses. Singler and O'Connor furnished her with various relevant police reports. Reyes identified herself to Haymer and also read him his *Miranda* rights in the presence of Singler and O'Connor, who were also present for the interview. Haymer said that he, McCoy, and Ivory had gone down to the lakefront to drink and get high. Ivory went to urinate and he heard Ivory talking to some man in a car and heard shooting. Then Reyes talked to McCoy. Singler and O'Connor were also present at the interview. Reyes identified herself and also read McCoy his *Miranda* rights. McCoy stated that he, Haymer, and Ivory went to the lakefront to get high and Ivory shot at something. McCoy also said that he did not possess the gun used by Ivory that night.

Reyes interviewed Ivory at approximately 3:40 p.m. on October 8. After interviewing him, she then asked all three men if they would be willing to take polygraph examinations. Each man agreed. Ivory said he was not with Haymer or McCoy at the shooting. He did, however, state that he saw McCoy the following Monday. McCoy told him at that time that, "I bumped myself a nigger." Ivory said he was with a friend named "O.J." or Orlando Johnson on the night of July 20, 1984. O'Connor called Orlando Johnson. Johnson stated that he had not seen Ivory since July 2 or 3 and that he was not with him on July 20, 1984. Ivory also said he was with a man named "Tecoe" or Martin Walker on the Monday after the shooting when he saw McCoy. O'Connor called Martin Walker. Walker told O'Connor that he had seen McCoy, Haymer, and Ivory in the area of 35th and State on Monday following the shooting, although they did not appear to be together. Walker told O'Connor that later that evening Haymer told him that "Ivory is crazy and that he shot somebody over by the lakefront." O'Connor testified that at 9 p.m. on October 8, he and his partner, Detective Murphy, placed Haymer and McCoy under arrest.

At approximately 10:30 a.m. on October 9, 1984, Detectives O'Connor and Carroll transported McCoy to 1121 South State where McCoy was taken to the polygraph room. An hour and a half later, O'Connor and Carroll returned McCoy to Area One. O'Connor testified that on the way back, he advised McCoy of his *Miranda* rights

and told him he had failed his polygraph exam. He also informed Mc-Coy that the detectives had a .38 caliber pistol taken from him by other officers in an unrelated arrest for unlawful use of a weapon several days after the shooting of Jesse Robinson and subsequently linked it to the shooting. O'Connor also told McCoy that "it would save a lot of time and trouble if you could just tell us what you know about this case." O'Connor further testified that just as he, Carroll, and McCoy were entering the Area One building, McCoy stated, "Wait a minute man. I'm going to tell you what I know." Carroll testified that it was about 11 a.m. when they placed McCoy in an interview room. Carroll and O'Connor then interviewed McCoy with regard to the events that took place on July 20, 1984. Singler and Morrissey were informed of McCoy's statements. Singler then called Reyes. Carroll testified that at no time did he or anyone in his presence hit or punch McCoy on October 9, 1984; that no police officer promised McCoy anything or gave him any inducements to make a statement relative to the events of July 20, 1984; that McCoy never complained of any mistreatment at the hands of the police officers; that defendant never indicated that he was in any form of physical distress or discomfort.

Reyes arrived at Area One at 1:50 p.m. on October 9, 1984, after Singler called to inform her that the polygraph results arrived. After conferring with Singler, Reyes interviewed McCoy. She initially reminded him that she was an assistant State's Attorney and then she read him his *Miranda* rights. Reyes made a written record of McCoy's oral confession. She testified that McCoy made no complaints of mistreatment by the police, that she did not observe any physical injuries, and that he was not in any physical discomfort during the interview. McCoy read and signed the statement.

At approximately 2:50 p.m. Reyes interviewed Haymer. She reintroduced herself and read him his *Miranda* rights. Reyes informed Haymer that McCoy had implicated Haymer in the shooting. At that point, Haymer gave her an inculpatory statement. Reyes also made a written record of Haymer's oral confession. Reyes and Singler also signed it. Reyes testified that Haymer did not make any complaints of mistreatment and did not exhibit any physical discomfort or indications he was suffering from pain. Singler testified that McCoy did not seem to be suffering from any physical distress on either October 8 or 9; that no one in his presence struck, hit, punched, or physically abused McCoy or Haymer; and that no complaints were made of mistreatment by police personnel.

Haymer testified to the following. He was questioned by police on

Thursday, October 4, 1984, and he accompanied the officers to Area One. He was not released until 11:45 p.m. on Saturday, October 6. He and McCoy went with two officers to Area One around noon on October 8. On October 9, Singler and another officer took him from the lockup to an interview room. They handcuffed one of his hands to the wall and demanded that he tell them the truth. Singler then kicked the chair out from under him and commenced kicking him. Singler told Haymer that an assistant State's Attorney would soon be there and that he should tell her that he and Ivory went down to the lakefront to do a robbery. After Reyes told Haymer that McCoy had made a statement, Haymer told her what the police wanted him to say. Haymer testified that he signed the confession because the police told him that if he didn't they would beat him up again. He was bruised over his right upper and lower side and noticed a bump on his wrist a week later. He stated that the beating lasted two minutes. He informed a paramedic and a doctor at the Cook County jail that he was beaten up.

Shirrish Parikh testified to the following. He was a doctor with a specialty in internal medicine. He is employed by Cermak Health Services. Part of his duties is to treat and care for prisoners in Cook County jail. He only examines patients who make complaints to paramedics who see new inmates as they arrive at the jail. On October 10, 1984, he examined Haymer because he had complained that on the previous day he was beaten by Chicago detectives. He stated that he was beaten several times all over his body and face and that he was also kicked in the chest. The doctor further testified that he examined Haymer and found two dollar-sized bruises 1 inch to 1½ inches in diameter, located between Haymer's fourth and ninth ribs on the right side. The bruises appeared to be 24 to 48 hours old. X rays showed no bruising of the lungs or any ribs being broken. The doctor noticed no injuries other than the two bruises.

Diane Smith testified that she picked up her boyfriend, Haymer, on October 6, 1984, at the police station; that she observed his body on Sunday when he was walking around in her apartment with only his shorts on; that she did not notice any bruises on his body and he did not complain of any pain on his body.

McCoy testified that on October 9, 1984, O'Connor and Carroll were returning him to Area One after he took a polygraph examination when O'Connor helped him get out of the car because he was handcuffed. O'Connor told him that he had told O'Connor a lie and that he was going to get the truth out of him one way or another. The detectives left him standing in an interview room with one hand hand-

cuffed to a ring in the wall. O'Connor returned and said he knew that McCoy had gone to the lakefront to commit robberies. He then struck McCoy in the ribs two or three times and again 20 minutes later.

O'Connor told him that he would keep beating him until he told O'Connor what he wanted to know. Finally, McCoy testified that he gave his statement to the assistant State's Attorney to stop the beatings.

Fawaz Fakbik testified that he was a doctor specializing in internal medicine, that he is employed by Cermak Health Services, and that he examines new patients at Cook County jail. His report on McCoy was made on October 10, 1984. It stated that McCoy had pain over his lower chest and swelling there. McCoy stated that he was beaten by members of the Chicago police department on October 9, 1984. X rays did not show any fracture of ribs but did show some soft tissue swelling. The doctor testified that the injury happened within three days.

Mary Haymer, sister of defendant McCoy, testified that she observed McCoy's body on October 8 and she did not see any bruises. Annie Davis, McCoy's girlfriend, testified that she saw McCoy without any clothes on October 7 and she did not observe any bruises or injuries to his rib cage.

On Friday, October 25, 1985, the circuit court granted both of defendants' motions to suppress their inculpatory statements because they were involuntarily induced by the results of McCoy's polygraph examination and the police lacked probable cause to arrest Haymer.

■ The first issue is whether the trial court erred in finding that the arrest of defendant Haymer was without probable cause. Probable cause exists if a police officer has knowledge of facts which would lead a reasonable person to believe that a crime has been committed and that it was committed by the defendant. (*People v. Neal* (1985), 111 Ill. 2d 180, 193, 489 N.E.2d 845; *People v. Thomas* (1984), 123 Ill. App. 3d 857, 862, 463 N.E.2d 832.) Whether probable cause exists in a specific instance depends upon all the facts and circumstances known to the officers at the time of the arrest. (*People v. Robinson* (1976), 62 Ill. 2d 273, 276-77, 342 N.E.2d 356.) It is the function of the trial court to analyze these facts and circumstances to determine their sufficiency, and a court's finding will not be disturbed unless it is shown to be manifestly erroneous. *People v. Clay* (1973), 55 Ill. 2d 501, 505, 304 N.E.2d 280; *People v. Thomas* (1984), 123 Ill. App. 3d 857, 863.

■ We believe that the trial court's finding that the police lacked probable cause when they arrested defendant Haymer was not mani-

festly erroneous. O'Connor testified that at 9 p.m. on October 8, 1984, Haymer and McCoy were placed under arrest. At the time, the police were aware of the following facts. Haymer's car was identified at the scene of the crime; Haymer and McCoy both acknowledged that they were at the scene of the crime, but stated that Ivory, on his own, had shot the victim; the police had recovered a weapon from McCoy which ballistics identified as the murder weapon; and Haymer had failed a lie detector test taken on October 5, 1984. At most, these facts gave the police reason to question Haymer. Yet, the Supreme Court has determined that common rumor or report, suspicion, or even a strong reason to suspect are not adequate grounds for the issuing of a warrant for arrest. (*Dunaway v. New York* (1979), 442 U.S. 200, 213, 60 L. Ed. 2d 824, 836, 99 S. Ct. 2248, 2257; *Henry v. United States* (1959), 361 U.S. 98, 101, 4 L. Ed. 2d 134, 137-38, 80 S. Ct. 168, 170.) There was, in fact, no reliable evidence that Haymer himself participated in the commission of the crime; but, rather, the evidence indicated that Haymer was merely present when Ivory committed the crime.

It is also evident that the police arrested Haymer on October 5, 1984, and October 8, 1984, for the purpose of conducting an expedition for evidence in hope of obtaining information upon which to predicate probable cause to justify an arrest. This kind of custodial detention has been consistently condemned by the Supreme Court. (*People v. Franklin* (1987), 115 Ill. 2d 328; *Dunaway v. New York* (1979), 442 U.S. 200, 216, 60 L. Ed. 2d 824, 838, 99 S. Ct.2248, 2258; *Brown v. Illinois* (1975), 422 U.S. 590, 603, 606, 45 L. Ed. 2d 416, 427, 428-29, 95 S. Ct. 2254, 2261, 2263.) In *Brown*, the court disapproved of arrests made for "investigatory" purposes on less than probable cause. The court stated that the impropriety of the arrest was obvious where the two arresting officers conceded that the purpose of the arrest was "for investigation" or for "questioning." *Dunaway v. New York* (1979), 442 U.S. 200, 216, 60 L. Ed. 2d 824, 838, 99 S. Ct. 2248, 2258.

■ When the police asked Haymer to accompany them to Area One Headquarters on October 4, 1984, they possessed no more information than they had in early July when they had questioned him. During interrogation, Haymer repeated the same version of events that he had previously given to the police. The police requested and Haymer agreed to take a polygraph examination. The examination took place at 9 p.m. that same evening. At about 2:30 or 3 a.m. on October 5, the police told Haymer that the polygraph examiner had said he was lying. When he refused to change his story, the police ar-

rested him. The police cannot rely on the results of a polygraph examination in making a probable cause determination. In *People v. Baynes* (1981), 88 Ill. 2d 225, 240, 430 N.E.2d 1070, the Illinois Supreme Court held that the results of a polygraph examination were not admissible in a trial court to prove either guilt or innocence of a defendant because of serious doubts about the reliability and scientific recognition of such tests and the prejudicial effect upon a jury of hearing such results. *People v. Szabo* (1983), 94 Ill. 2d 327, 363, 447 N.E.2d 193 (court may not consider results of a polygraph exam in a sentencing hearing); *People v. Yarbrough* (1982), 93 Ill. 2d 421, 427, 444 N.E.2d 493 (court may not consider results of a polygraph exam in a post-trial motion).

In the late afternoon of October 5, the police brought Gloria Shanklin to Area One Headquarters. After agreeing to take a polygraph exam, she admitted that she was not with Haymer at the lakefront on the night of the shooting. She stated that Haymer asked her to lie for him. At about 7:30 or 7:45 p.m., the police again questioned Haymer. After the police advised him of his *Miranda* rights and told him what Shanklin had said, Haymer told the police what really happened. Haymer told the police that he had been at the lake with McCoy and Ivory on the night of the shooting and that Ivory had shot the victim. At 2 a.m. on October 6, the police consulted with Grinbarg regarding charging Haymer. Grinbarg advised that the State's Attorney's office would not approve charges against Haymer because the police lacked probable cause and more investigation was needed. The police then requested that the prisoner be held past court call in order to allow the police more time to investigate. Haymer was, in fact, not brought before a judge. He was released by the police at 11:30 p.m. on October 6, after more than 60 hours of custody. The police again arrested Haymer on October 8, when they possessed no more information than they had when he was released on October 6. Similar to the conduct of the police in *Brown*, the police in the instant case admittedly arrested Haymer for the purpose of investigating and questioning him. In fact, the police refused to release Haymer even after the assistant State's Attorney informed them that he did not believe that the police had probable cause to charge Haymer. In light of these facts, we cannot say that the finding of the trial court was manifestly erroneous.

■ When a confession is obtained from a defendant through custodial interrogation, after an illegal arrest, that confession must be suppressed unless the State can meet its burden of establishing that intervening events have broken the causal connection between the il-

legal arrest and the confession so as to render the confession an act of free will. (*Taylor v. Alabama* (1982), 457 U.S. 687, 690, 73 L. Ed. 2d 314, 319, 102 S. Ct. 2664, 2667; *Brown v. Illinois* (1975), 422 U.S. 590, 602, 45 L. Ed. 2d 416, 426, 95 S. Ct. 2254, 2261; see *Dunaway v. New York* (1979), 442 U.S. 200, 218, 60 L. Ed. 2d 824, 839-40, 99 S. Ct. 2248, 2259-60.) The State, however, failed to raise this issue in the trial court or in this court. Accordingly, the State has waived this issue. *People v. Hollman* (1984), 103 Ill. 2d 133, 176, 469 N.E.2d 119.

■■ The second issue is whether Haymer and McCoy's inculpatory statements were voluntarily given. The test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Clark* (1986), 114 Ill. 2d 450; *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601.) The court looks to the totality of circumstances in determining whether a statement was voluntarily given. (53 Ill. 2d 62, 70, 289 N.E.2d 601.) In determining whether the statements were given voluntarily, the court may consider defendant's age, intelligence, background, mental capacity, and education (*People v. Martin* (1984), 102 Ill. 2d 412, 427, 466 N.E.2d 228), the duration of detention and questioning (*Miranda v. Arizona* (1966), 384 U.S. 436, 476, 16 L. Ed. 2d 694, 724-25, 86 S. Ct. 1602, 1629), whether there was a delay in presenting defendant to a judge for preliminary hearing (*People v. Davis* (1966), 35 Ill. 2d 202, 206, 220 N.E.2d 222), whether the police illegally detained defendant (*People v. LaFrana* (1954), 4 Ill. 2d 261, 266, 122 N.E.2d 583), and whether defendant was physically abused (*People v. Martin* (1984), 102 Ill. 2d 412, 427, 466 N.E.2d 288). The procedural safeguards outlined in *Miranda* recognized that during custodial interrogation coercion can be mental as well as physical. (102 Ill. 2d 412, 426, 466 N.E.2d 288.) The State has the burden of showing by a preponderance of the evidence that a statement was made without compulsion of any sort. (*Lego v. Twomey* (1972), 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627-28, 92 S. Ct. 619, 626-27; *People v. Travis* (1984), 122 Ill. App. 3d 671, 674, 462 N.E.2d 654.) The trial court's finding on the issue of whether a confession is voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence. *People v. Brownell* (1980), 79 Ill. 2d 508, 521, 404 N.E.2d 181.

■■ ■ The trial court ruled that a confession made after an individual has taken a polygraph examination renders such inculpatory statements involuntary and inadmissible as a matter of law. While we believe that the trial court erred in making this ruling, we may affirm the trial court's judgment on any ground warranted. (*People v. Hollo-*

*way* (1985), 131 Ill. App. 3d 290, 306, 475 N.E.2d 915.) Our review of the evidence leads us to conclude that the statements of the two defendants were induced by an illegal detention and isolation and due to long periods of confinement, physical abuse, and duress.

Defendant Haymer was illegally detained by the police for approximately 60 hours between October 4 and October 6. He was again illegally detained by the police for 24 hours between October 8 and 9 before he made an inculpatory statement. His release from custody for a 36-hour period does not negate the 60 hours of illegal detention which preceded it. During the 24-hour period of illegal detention on October 8 and 9, the memory of a prior lengthy detention plus the constant questioning of the officers during that period was certainly a significant factor in producing Haymer's inculpatory statement.

Haymer testified that during the early afternoon of October 9, two officers handcuffed one of his hands to a ring on the wall in an interview room and demanded that he tell them the truth. One of the officers then kicked the chair out from under him and commenced kicking him. The same officer told Haymer that an assistant State's Attorney would soon be there and that he should tell her that he and Ivory went down to the lakefront to do a robbery. Shortly thereafter, Reyes interrogated Haymer. After Reyes told Haymer that McCoy had implicated him in the shooting, Haymer confessed. The police denied that they physically abused or beat Haymer. However, where it is clearly established that a defendant has received injuries while in police custody, something more than a mere denial by the police of coercion is required. The State must show by clear and convincing evidence that the injuries were unrelated to the confession. (*People v. LaFrana* (1954), 4 Ill. 2d 261, 267, 122 N.E.2d 583.) However, we note that the court in commenting on the evidence regarding defendant's injuries observed that "the truth lies somewhere between the testimony of defendants, police and Miss Reyes." There was testimony by a physician who examined Haymer at Cook County jail on October 10, 1984, that Haymer had two dollar-sized bruises 1 to 1½ inches in diameter on his ribs and that these bruises appeared to be 24 to 48 hours old. There was also testimony by Haymer's girlfriend that she observed no bruises on Haymer's body on October 6 or October 7. The trial court ruled that "there is insufficient evidence to show that police officers inflicted the bruises which the defendants unquestionably exhibited upon their entry in the Cook County Department of Corrections." While the finding of the trial court judge is entitled to great weight insofar as credibility of the witnesses is concerned, a determination of the issue here does not rest upon a

question of credibility. (*People v. Davis* (1966), 35 Ill. 2d 202, 207, 220 N.E.2d 222.) The undisputed evidence shows that Haymer was injured while in police custody and that the injuries were not explained by the State. In viewing the totality of circumstances, it is our opinion that Haymer's confession was not voluntary and the trial court's suppression of that statement was not contrary to the manifest weight of the evidence.

For much the same reasons, we believe that McCoy's statement was involuntarily given. McCoy was held for over 24 hours, after being brought to Area One Headquarters by police officers on October 8, without being charged and without being brought before a judge. This conduct indicates that the police held McCoy in the hope that something might turn up to incriminate him. As stated above, this conduct has been clearly condemned by the Supreme Court in *Brown* and *Dunaway*.

McCoy testified that he was physically abused by the police; that on October 9, 1984, he was placed in an interview room after taking a polygraph exam; that O'Connor told him that "he was going to get the truth out of him one way or another"; that O'Connor handcuffed one of his hands to a ring on the wall, without a chair to sit on; that O'Connor hit McCoy in the ribs two or three times and did the same 20 minutes later; and that O'Connor told him that he would keep beating him until he told O'Connor what he wanted to know. Later that afternoon, McCoy gave an inculpatory statement to Reyes. There was testimony by a physician who examined McCoy at Cook County jail on October 10, 1984, that McCoy had pain over his lower chest and swelling there. The doctor testified that the injury happened within three days. While the police denied ever threatening or physically abusing McCoy, the State must submit more than a mere denial in order to demonstrate by clear and convincing evidence that the injuries were unrelated to the confession. *People v. LaFrana* (1954), 4 Ill. 2d 261, 267, 122 N.E.2d 583.

■ Defendant McCoy also alleged that the use of a polygraph examination was coercive. We believe that the mere fact that the accused confessed to a particular crime following a polygraph examination does not by itself render the confession inadmissible in evidence. (*People v. Taylor* (1974), 58 Ill. 2d 69, 76-77, 317 N.E.2d 97; *People v. Stevens* (1957), 11 Ill. 2d 21, 27, 141 N.E.2d 33; *People v. Stickley* (1983), 114 Ill. App. 3d 167, 172, 448 N.E.2d 612; *People v. McCue* (1977), 48 Ill. App. 3d 41, 45, 362 N.E.2d 760; *cf. People v. Sims* (1946), 395 Ill. 69, 71-72, 69 N.E.2d 336; *People v. Eickhoff* (1984), 129 Ill. App. 3d 99, 100-106, 471 N.E.2d 1066.) Yet, the polygraph ex-

amination is a form of interrogation. (*People v. Franklin* (1987), 115 Ill. 2d 328.) We note that the Illinois Supreme Court stated in *Baynes* that "[n]o other form of evidence is as likely to be considered as completely determinative of guilt or innocence as a polygraph examination." (*People v. Baynes* (1981), 88 Ill. 2d 225, 244, 430 N.E.2d 1070.) We cannot say the use of the results of the polygraph examination was not a contributing factor in inducing McCoy's statement. Considering this circumstance with the undisputed evidence of his illegal detention and the failure of the prosecution to establish by clear and convincing evidence that the injuries were unrelated to the confession, we find that defendant McCoy's statement was not voluntary and the order of the trial court was not against the manifest weight of the evidence.

In view of the foregoing, the orders of the circuit court are hereby affirmed.

Affirmed.

SCARIANO, P.J., and BILANDIC, J., concur.