THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROOSEVELT CLAY, Plaintiff-Appellant.

First District (6th Division) Nos. 1—88—2187, 1—89—3115 cons.

Opinion filed December 28, 1990.—Rehearing denied April 12, 1991.

292

Xinos & Xinos, Ltd., of Chicago (Constantine P. Xinos, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Margaret M. Regan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

In a consolidated action, defendant appeals his 1988 triple murder conviction and a 1989 ruling denying him a new trial on the murders based on newly discovered evidence. On the murder case itself, defendant contends that the trial court improperly denied his motion

to suppress statements he made inculpating him in the murders. On the motion for a new trial, defendant contends the trial court erred in rejecting new evidence which defendant contends proved the defendant was telling the truth when he made the damaging statements uttered during plea negotiations. The State contends that the motion to suppress in the murder trial was properly denied and that the "new" evidence presented by defendant is merely cumulative and serves only to impeach a State witness, which is not enough to warrant a new trial.

In 1975, defendant Roosevelt Clay was subpoenaed to appear before a Cook County grand jury hearing evidence on the murder of three people in Chicago, Dr. Lawrence Gluckman, Tressie Harris and Minnie Harris. He exercised his right to remain silent initially but later testified that he had no knowledge of the deaths of the three individuals. He was never charged. Eight years later he was named defendant in two armed robbery cases pending in two different courts in Cook County.

Defendant testified at the hearing on the motion to suppress that he believed Chuck Renzeno and Willie Carter set him up for armed robbery because Carter mistakenly believed defendant had stolen Carter's checkbook and cashed $22,000 worth of checks. In February 1983, in an effort to prove he was set up for the first armed robbery, defendant phoned the Federal Bureau of Investigations (FBI) in Chicago and agreed to provide them with information on various individuals whom he believed had set him up. The FBI and defendant agree that it was at this time that the defendant began cooperating and provided them with information on drug trafficking; however, no "plea negotiations" were underway.

On May 17, 1983, a jury found defendant guilty of the first of the two armed robbery charges. Within the next few weeks, defendant phoned the FBI again, asking if they would help him. Defendant maintains that he continued to cooperate with the FBI because agents told him they would aid in his effort to receive a concurrent minimum sentence of six years for both armed robbery charges when he pled guilty to the second armed robbery. Defendant contends he was told on June 3, 1983, that he had to provide information on something of interest to State authorities in order for the FBI to help him out on the second robbery case.

On June 6, while in custody, defendant phoned the FBI again, this time telling them he could provide information to them about a murder in Wisconsin in 1982. At this point, defendant contends he entered into plea negotiations, offering to plead guilty to the second

State robbery charge and provide more information on other crimes if, in exchange, he would receive six-year concurrent sentences for the two armed robbery convictions. The State contends that defendant volunteered information about the murder and provided all subsequent information without inducement.

On June 13, 1983, two FBI agents, including Scott D. Jennings, went to the Cook County jail to interview the defendant. Consistent with bureau policy, they read defendant his *Miranda* rights and had him sign a waiver of rights form. Thereafter, he provided information on his involvement in a homicide in Wisconsin and a triple homicide in Chicago for which he was later indicted. This meeting marked the first time defendant told the FBI about the Chicago murders.

On August 29, 1983, defendant repeated the statements to two Chicago police officers who handled the initial investigation on the 1975 murders after Jennings had contacted them. Defendant concedes that no promises were made to him by the Chicago police. He later testified at a motion to suppress hearing that he made the statements to State authorities because FBI agent Jennings, with whom he had been working, told him not to worry but just to cooperate with the State police and answer their questions.

In December 1983, defendant was sentenced to nine years for the first armed robbery conviction. No FBI agent spoke on his behalf at the sentencing hearing. Defendant subsequently pled guilty on the second armed robbery charge and received a sentence of nine years to run concurrently with the first nine years.

In March 1984, angered because he did not receive a six-year sentence for the armed robberies, defendant ceased cooperating with the FBI.

Defendant was indicted September 10, 1984, for the 1975 murders of Dr. Lawrence Gluckman and two of his patients, Minnie and Tressie Harris. On July 14, 1986, after the State responded to discovery requests, the defendant moved to suppress statements made by him in 1983 to members of the Chicago police department and the FBI, which implicated him and others in the triple murder in Chicago.

Defendant argues that the statements were made during plea negotiations involving two unrelated armed robbery charges he faced and were therefore inadmissible under Supreme Court Rule 402(f) (134 Ill. 2d R. 402(f)). Rule 402(f) states: "If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting

agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." 134 Ill. 2d R. 402(f).

On May 2, 1988, the court heard testimony and arguments on defendant's motion to suppress his statements. The defendant testified on his own behalf, stating that he first phoned the FBI in February 1983 after he was released on bond on pending State armed robbery charges.

The defendant testified that he wanted to prove he had nothing to do with the robbery. When asked why he helped the FBI out, defendant said: "[I]f he [sic] help me to prove that I didn't do this here, I'll hook Chuck Renzeno and Willie and [Mike] Switek up whatever their business dealings were." Defendant testified that as part of his cooperation in the ensuing months, he wore a wire and was under surveillance when he met with Switek "just to get Willie and Chuck Renzeno for getting me at first. That's what it was about."

Defendant testified that he brought up his pending armed robbery cases around the third or fourth time he met with FBI agent Jennings. Defendant testified that: "They wanted to brief me all that I knew, and they told me that they will help. They give me continuances as long as it takes to do this and at the end they make it be known that cooperation and try to get me less time as possible." Defendant testified that it was his understanding that he would continue to help the FBI out, providing them information on drug running and other criminal activity and that in return they would have his case delayed in court.

Defendant testified that he appeared in court on May 17, 1983, and learned that his case was set for trial despite FBI agents' assurances that the case would be continued until they had time to gather more information from him. He phoned an FBI agent named Ross Rice, who spoke to the defendant's lawyer. Defendant testified that he heard his lawyer say: "Whatever you guys are going to do, you better come on and do it because we are going to trial."

Defendant was convicted of the first armed robbery charge on that day, May 17. In June, while in jail, defendant testified that he called the FBI because he wanted their help in obtaining concurrent sentences if he was convicted of the second armed robbery charge. He testified that: "They told me they are going to get me out and don't worry about it. We need to give the State something. We have to give the State something." Defendant testified that he was told this several times and told that if he could give the State something, "they would get me out." On cross-examination, he testified that it was at this time that he cut a deal with the FBI to get concurrent

time for the two armed robberies. He had no plea agreement before his first trial and conviction.

Defendant testified that on June 13, 1983, the FBI agents came to the jail and he told the FBI about the Chicago and Wisconsin homicides in which he was involved. He denied being given his *Miranda* rights before he spoke but he admitted signing a written waiver of his rights. He denied that he read the waiver but acknowledged that he can read. He said that before he gave the FBI information on the murders, the FBI agent agreed to see to it that he received concurrent, minimum time on the State armed robberies at the time of the sentencing. Defendant testified that the only reason he spoke out about the murders after eight years "was to make a deal." "The deal on concurrent time. I was facing consecutive time. I just got found guilty for one armed robbery." But on cross-examination, defendant conceded that before he contacted the FBI in June 1983 he received word that Willie Carter had raped or had attempted to rape the mother of his two-year-old son. Defendant admitted that he was mad at Carter and wanted to get even. The State contends that this was defendant's motivation and not an effort to get concurrent minimum time.

Defendant testified that a week or two after he spoke with Jennings about the murder he was transferred to a Federal prison and he was assured that the sentencing on his armed robbery conviction would be postponed until he had finished gathering information on Switek for the FBI. He testified that his understanding of the plan was for the sentencing to come later so that the FBI could arrange that he would get concurrent six-year prison sentences after he pled guilty to the second armed robbery conviction.

Defendant testified that after he spoke to FBI agent Jennings about the homicides, he was told by Jennings that they had located the Chicago police officers involved in the triple-homicide investigation so he could talk to them. Defendant testified that: "He told me they will be coming over to talk to you. 'Don't worry about it. This is to help me. We have to go through this to get where we are going. So they are coming over. Don't worry about. Just answer all the questions to the best of your knowledge and cooperate with them.' " Jennings denied telling defendant these things.

Defendant spoke with the Chicago police officers on August 29, 1983. Defendant testified that he was given his rights and the Chicago police officers, while an FBI agent was present, told him they could promise him no deals, but that "[a]ll we want is Willie, the

shooter." Defendant related information about the Wisconsin murder and about the triple murders in Chicago.

Defendant testified that on December 19, 1983, he was taken to the State's Attorney's office, where he spoke to the police officers again and one of the officers told him at the time: "Look, this is what is happening. You are going to plead guilty to 14 years. You are going to testify against anybody truthfully to the best of your ability or else we are going to start proceedings and indict you Friday."

Defendant challenged the officers, questioning if they had cleared that with the FBI agent with whom he had been working. Defendant testified that the officer swore at him and told him the FBI agent had nothing to do with the deal being cut. Defendant related that he later spoke to his own attorney, who told him that the officers and FBI were tricking him into confessing. The attorney told him to quit talking.

In December 1983, defendant was sentenced on the first armed robbery conviction to nine years in prison. Before sentence was imposed, defendant spoke with the judge in chambers so it would not be made public that he had been cooperating with the FBI. On January 4, 1984, he pled guilty to the second armed robbery charge and was sentenced to a second nine-year term to run concurrently. He testified that no FBI agent spoke on his behalf at either of the sentencing hearings.

Defendant testified that after he was transferred to Stateville prison in Joliet, an FBI agent went there to speak with him about the 1982 Wisconsin murder defendant had alluded to earlier, but defendant testified that he refused to speak to the FBI.

Jennings, the FBI agent, testified at the hearing on the motion to suppress. He testified that he told defendant the first day they met that he couldn't make any promises regarding sentencing or penalties but he could let State officials know that he was cooperating.

Jennings contradicted the defendant's testimony, stating that defendant volunteered testimony about the triple murders in Chicago. He denied ever telling defendant he would attempt to get the defendant minimum time if convicted of the armed robberies. He admitted defendant started to give information to the FBI after he was told the FBI would tell the State he was helping.

He denied that any plea bargaining was going on or promises were given. He testified that he advised the defendant of his constitutional rights June 13, 1983, before speaking with the defendant

about any murders. On cross-examination, he conceded that it is standard bureau procedure to give *Miranda* rights to anyone in custody. He also testified he considered defendant's help to be "cooperation." He testified that defendant was told he could be prosecuted for the murders of which he spoke but was never told he could be prosecuted for the drug trafficking activities on which he was giving information.

Defendant's attorney, Michael Goggins, testified that Jennings had indeed promised defendant, as well as Goggins, that he would inform prosecutors that the defendant was cooperating, but then failed to do so. Goggins testified that the defendant told him he had been assured he would not be charged with any crime about which he was telling the FBI. "He was assured that Jennings was going to go to bat for him in front of Judge Gillis and the prosecutors there and he did not anticipate at any time being charged with any other criminal activity."

Goggins said the trial judge knew of defendant's cooperation with the FBI at the time he sentenced the defendant after his first armed robbery conviction. Goggins testified that he spoke to the defendant after the defendant received the nine-year sentence on the first armed robbery conviction. Goggins said the defendant was upset and wanted to know why he had not received a six-year sentence.

After hearing testimony, the trial court denied the motion to suppress. The trial court stated in its findings that the defendant was told on several occasions that the FBI could make no promises or deals but did say they would advise the prosecutor of his cooperation if he did choose to cooperate. The judge stated that: "There is no question in the court's mind that the prosecutors in Judge Gillis' courtroom were fully aware of the fact Mr. Clay was cooperating with the federal authorities. He had been transferred to the MCC, his case was continued from, I want to say six or seven months between the time—the disposition of the case, the finding in the case and the sentencing."

The trial court found defendant's statements voluntary, relying on the two-part test enunciated by the supreme court in *People v. Friedman*: (1) whether in making the statement the accused exhibited a subjective expectation to negotiate a plea and (2) whether his expectation was reasonable. *People v. Friedman* (1980), 79 Ill. 2d 341, 351, 403 N.E.2d 229, 235.

Here the court found that "while there might be an argument made that these statements were made by Mr. Clay to get a lesser sentence. There might also be an argument made that those state-

ments were made by the defendant to get Mr. Switek and Mr. Carter, and I believe those, in effect, were—was his tendency from the witness stand." As to the second prong, the court said "there is no objective way that we can categorize what transpired here as plea negotiations or plea agreements or plea discussions. He was told time and time again that there were no deals, that the FBI could make no deals. The Chicago Police Department advised him at least one time *** they could make no deals. He was admonished. He signed a waiver indicating that there were no deals. These discussions, in the court's mind cannot under any reading of the facts in this case be called plea negotiations. There was no coercion. There was no promise. The statements were voluntary. Respectfully, the motion to suppress the statement will be denied."

A jury was chosen and the defendant's case went to trial May 3, 1988. On May 10, 1988, the jury returned a verdict finding defendant guilty of the murders of Gluckman and his two patients. Defendant filed this appeal.

In 1989, while his appeal was pending, defendant was indicted for the 1982 murder in Wisconsin about which he had told FBI officials. While the charge was pending, defendant learned that a Wisconsin police chief, now retired, had spoken with Jennings about the Wisconsin murder on the same day that defendant first admitted to Jennings that he was involved in the crime. A police report was prepared in Wisconsin that detailed the conversation.

Defendant filed a motion seeking a new trial on grounds that new evidence had been discovered. He argued that the new evidence proved plea negotiations were in fact underway when defendant confessed to the Wisconsin and Chicago murders. The State moved to have the defendant's motion dismissed, contending that the evidence was merely cumulative.

Before the trial court ruled on the motion for a new trial, it viewed the police report which was attached as an exhibit to the motion. The report states that Jennings had called the chief June 7, 1983, because "they had a black male in custody who they believed might be responsible for the murder of Ernest Kamrath." The report went on to state that "this black male was in the process of attempting to arrange a deal to lessen charges against him and in turn was to supply information as to the party or parties responsible for the Ernest Kamrath shooting."

Defendant also presented, as part of the exhibits to his motion, a transcript of Jennings' testimony at the Wisconsin trial. Jennings was then asked, "And did Roosevelt Clay indicate to you that he was

trying to work out a deal to lessen charges and wanted your help?" Jennings responded, "Yes, sir."

Defendant argued that this was more than impeachment and was not merely cumulative but that it went to the crux of whether the motion to suppress should have been granted. The trial court, again following *Friedman,* found that the new evidence would not have prompted the court to rule differently on the motion to suppress and therefore denied defendant's motion for a new trial. Defendant appeals the denial of the motion for a new trial. The two appeals are consolidated before this court.

■ First we consider whether the trial court properly denied defendant's motion to suppress on a finding that the statements implicating him in murder were voluntary. A trial court's finding that a defendant's statement was voluntary will not be disturbed on appeal absent a showing that it is against the manifest weight of the evidence. (*People v. Haymer* (1987), 154 Ill. App. 3d 760, 506 N.E.2d 1378.) The same standard applies to uphold a trial judge's determination of each witness' credibility. *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.

Defendant argues that the FBI agent set the ground rules from the start, telling defendant he must disclose "everything" in exchange for help so he would be given the minimum time and concurrent sentences on two State armed robbery charges. Defendant argues that the fact that ongoing plea negotiations were taking place is evident not only in defendant's testimony but also in the testimony given by the FBI agent. The agent testified during the motion to suppress defendant's statements that: "When we explained to him his cooperation, what I usually tell people, and we want you to be fully cooperative as I did in this case. We want to know what you're doing. If you don't tell us everything and you are in fact running cocaine or selling bombs or doing whatever on the side and we find out about it we will fully prosecute you." When asked if that meant that defendant would not be prosecuted as long as he told the truth and wasn't caught doing anything wrong, Jennings answered, "That's correct and I said fully cooperate and tell us fully what you are involved in in the past and not have anything jump up that you didn't tell us about, you can be prosecuted. This gets to the trial stage, we have you as a witness and you didn't tell us about some crime you committed years ago you are going to be fully prosecuted for this."

■ ■ The test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort at the time he confessed. (*Haymer*, 154 Ill. App. 3d 760.) Both the language

used and the surrounding circumstances are pertinent to a determination of whether a promise was given in exchange for a confession. (*People v. Buxton* (1975), 28 Ill. App. 3d 429, 328 N.E.2d 703.) A prosecutor's promise or agreement to a defendant must be fulfilled. *Santobello v. New York* (1971), 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495; *People v. Starks* (1985), 106 Ill. 2d 441, 478 N.E.2d 350.

Defendant admits he signed a *Miranda* waiver, but cites *People v. Shaw* (1989), 180 Ill. App. 3d 1091, 536 N.E.2d 849, for the proposition that the court should look to what prompted defendant to confess and not whether he signed a *Miranda* waiver, to determine whether the confession is admissible. Defendant argues further that it was reasonable for him to believe that talking to the Chicago police about the murders was simply part of his obligation to cooperate with the FBI and in fact that he was told by them that he had to "give the State something" in order for the FBI to help him with the armed robbery sentences. He contends there is no other reason he would risk a murder conviction when he was facing only two armed robbery charges at the time.

The State, however, contends that defendant was not motivated by a potential plea agreement but by a desire to get even with Willie Carter after he was told Carter had tried to sexually assault his girlfriend. Defendant did admit he was mad at Carter and wanted to get even by getting Carter off the streets. In addition, the State argues that before the statements were made, defendant was advised of his *Miranda* rights, signed a waiver form and agreed to make a statement, evidencing voluntariness on his part and the defendant was told that statements he made could be used against him. The State denies that defendant was told he had to provide "something" for the State in order to get help on a plea.

The court may consider several factors to determine whether a statement was voluntary. These include the defendant's age, intelligence, education, background and mental capacity. (*Haymer*, 154 Ill. App. 3d at 770.) In addition, the court can consider the conditions surrounding the confession such as the duration of defendant's detention, mental and physical abuse by police officers and the existence of threats. *Haymer*, 154 Ill. App. 3d at 770.

The State argues that even if an agreement existed initially, it was an agreement that the FBI would help defendant clear his name and not to prevent State prosecution. The State argues that when defendant phoned the FBI and indicated a willingness to provide information on a murder, defendant was "reinitiating contact with the FBI" and defendant's motivation had changed. He no longer wanted

help on his armed robbery cases, he just wanted to "get" Willie Carter.

Defendant has offered only his word and some supporting circumstances to prove his position. We note that defendant had not yet been sentenced for either armed robbery conviction at the time he provided information on the murders. We note too that defendant continued to cooperate with the FBI after he was convicted on the first armed robbery charge and that Federal officials had him transferred out of Cook County jail to a Federal prison, the Metropolitan Correctional Center, between his conviction and sentencing. We note too that defendant appeared before a Federal grand jury during that time period and, when asked, told jurors that he was cooperating in order to get a lighter sentence.

██ But the trial judge also heard FBI agent Jennings' testimony that no deal existed and that Jennings had warned defendant his statements could be used against him when he gave them. State evidence showed defendant had been warned of his *Miranda* rights and had signed a waiver.

The trial court is in the best position to weigh the credibility of the witnesses. We cannot say that the trial court's decision, based on the information before it at the time, was against the manifest weight of the evidence. We affirm the trial court's decision to deny defendant's motion to suppress.

 Defendant next contends the trial court erred when it permitted State witnesses to testify as to what defendant allegedly told them about his involvement with the murders. Any statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be used against him as an admission. (*People v. Howell* (1977), 53 Ill. App. 3d 465, 368 N.E.2d 689.) The court properly determined that no plea negotiations were underway when the defendant made these statements and that therefore they were voluntary and admissible.

On July 18, 1989, the defendant filed a motion for a new trial based on newly discovered evidence. The evidence was provided in a 1983 police report from Waukesha, Wisconsin, a report which defendant argues is proof that he was in the process of plea negotiations when he made the statements used against him at his murder trial in Illinois.

The report, prepared by a Waukesha detective at the direction of his former police chief Richard Sader, stated that Agent Jennings phoned Sader on June 7, 1983, the same day defendant first told Jennings he had information about the 1982 Wisconsin murder and

before defendant had disclosed information about the triple murder in Chicago. The report states that Jennings told Sader "they had a black male in custody who they believed might be responsible for the murder of Ernest Kamrath *** this black male was in the process of attempting to arrange a deal to lessen charges against him and in turn was to supply information as to the party or parties responsible for the Ernest Kamrath shooting."

On September 8, 1989, the State moved to dismiss the defendant's motion for a new trial. The State contended the newly discovered evidence merely impeached Jennings' testimony and that Jennings' testimony alone was not the basis for the trial court's denial of defendant's motion to suppress.

On October 13, 1989, the trial court heard evidence on defendant's motion and then recessed to permit defendant to obtain transcripts which would provide further new evidence. Before the next hearing date, defendant provided the court with exhibits to his motion that included transcripts of testimony given by Wisconsin Police Chief Sader and Jennings in September 1989 during defendant's trial for the Wisconsin murder. Sader's testimony confirmed the telephone conversation with FBI agent Jennings and the accuracy of the report. Jennings had testified at the Wisconsin trial on September 23 and 26, 1989. He was asked, "You knew prior to June 13th that Roosevelt Clay was charged with armed robbery, two armed robberies in Chicago?" Jennings answered: "I believe it was two, possibly three." Then he was asked: "And did Roosevelt Clay indicate to you that he was trying to work out a deal to lessen charges and wanted your help?" Jennings answered: "Yes, sir."

On November 3, 1989, the trial court heard the remainder of the arguments on defendant's motion for a new trial and then denied defendant's motion. The court relied on *People v. Chew* (1987), 160 Ill. App. 3d 1082, 1085-86 513 N.E.2d 1099, which stated that: "To warrant a new trial, newly discovered evidence must be material, so conclusive it will probably change the result, discovered after the trial, and incapable of being discovered prior to trial by the exercise of due diligence." The State does not challenge defendant's diligence or his allegation that the evidence was discovered after the trial. The State contends, however, that the evidence is not so material that it could be considered conclusive in that it would change the results of the murder conviction. The State argues that the material from Wisconsin is merely impeachment of the FBI agent. Newly discovered evidence, the effect of which is to discredit, contradict and impeach a witness does not afford a basis for the granting of a new trial. (*Peo-*

*ple v. Wicks* (1973), 15 Ill. App. 3d 318, 304 N.E.2d 134.) Newly discovered evidence can justify the grant of a new trial *only* when that evidence directly concerns the crime for which defendant was convicted. *People v. Gray* (1988), 166 Ill. App. 3d 586, 520 N.E.2d 93.

■ Applications for a new trial based on newly discovered evidence are not looked on favorably by the courts. (*People v. Holtzman* (1953), 1 Ill. 2d 562, 116 N.E.2d 338.) Such a motion is left to the discretion of the trial judge and will not be disturbed on review absent abuse. *People v. Martin* (1983), 112 Ill. App. 3d 486, 445 N.E.2d 795.

In *People v. Cotell* (1921), 298 Ill. 207, 131 N.E. 659, a new trial was ordered where newly discovered evidence showed a key witness lied and that witness' testimony was the very foundation of the State's case. There the court said that newly discovered evidence showing the State's principal witness lied concerning material matters is not necessarily cumulative evidence, even though she may have been impeached by the new evidence.

■ The trial judge denied defendant's motion for a new trial, applying the two-pronged test from *Friedman*. The court found that though defendant may have had a subjective expectation to negotiate a plea, that expectation was not reasonable. He granted the State's motion to dismiss the motion for a new trial, stating that the new evidence presented would not have altered his decision on whether to suppress defendant's statements.

For all the foregoing reasons, the judgment of the trial court as to defendant's conviction for murder and the court's denial of the pretrial motion to suppress and the denial of the post-trial motion for new trial based on newly discovered evidence is affirmed.

Judgment affirmed.

McNAMARA and EGAN, JJ., concur.