THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GEORGE MOORE, Defendant-Appellant.

First District (1st Division) No. 86—2412

Opinion filed December 30, 1988.

Randolph N. Stone, Public Defender, of Chicago (Stephanie L. Ellbogen and Jeffrey M. Howard, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINLAN delivered the opinion of the court:

The defendant, George Moore, was charged with armed violence and with the murder of Jerry Battle. Following a jury trial in the cir-

cuit court of Cook County, the defendant was found guilty of murder. The trial judge denied defendant's post-trial motions and sentenced him to 40 years' imprisonment. Defendant then appealed his conviction and sentence to this court.

Jerry Battle, the victim, was shot on October 18, 1985, in the lobby of a 14-floor Chicago Housing Authority apartment building located at 2417 W. Adams. The victim's friends drove him to Cook County Hospital, where he later died. Three months after the shooting, the defendant was arrested and charged with murder.

At defendant's trial, Officer Bolling, a Chicago police officer, testified that he was on duty on October 18, 1985. He received a radio message at approximately 3:30 p.m. saying that a man had been shot at 2417 W. Adams. He drove to the apartment building and discovered that the victim had been taken to Cook County Hospital. Officer Bolling then proceeded to the hospital, where he questioned the witnesses to the shooting. Based on his interviews, Bolling was able to get a description of the shooter. He was described as a black male, 6 feet to 6 feet 1 inch tall, weighing 160 to 170 pounds, who wore a cowboy hat and went by the nickname "Duke."

David Haywood then testified for the State that he was in the lobby of 2417 W. Adams on October 18, 1985, at 3 p.m. He saw the defendant, George Moore, whom he also knew as "the Duke," arguing with the victim. The defendant was wearing jeans, a vest, and a cowboy hat. Haywood heard the victim say, "Go on man, I don't want to fight you." The defendant then walked a few steps, turned around and said, "I'm the Duke nigger," pulled out a shotgun, shot the victim, and ran. As Haywood, Kevin Chester and Jackie Davis started to lift the victim into a car, the defendant returned and reloaded his shotgun, so they dropped the victim and ran. When the defendant ran away a second time, Haywood and the others put the victim in a car and drove him to Cook County Hospital.

Haywood testified that he talked to Officer Bolling at Cook County Hospital and told Bolling, and later told some other detectives, that the Duke was the one who shot the victim. On cross-examination, Haywood admitted that he did not initially tell Bolling that he was an eyewitness to the shooting, but explained that this was because he was afraid the Duke would come after him.

Jillian McLaughlin was the next witness to testify for the State. She said that she was a violent crimes detective and was on duty on October 18, 1985. At approximately 5 p.m., she was sent to Cook County Hospital to investigate the Battle homicide. She interviewed David Haywood at the hospital, who told her that he witnessed the

shooting, but was afraid to say who or what he had seen. On cross-examination, McLaughlin testified that although Haywood told her that he witnessed the shooting, she did not put this statement in her report because Haywood asked her not to record his statement until the killer was arrested. McLaughlin testified that she catalogued Haywood's statement in her mind and never wrote it down.

Following McLaughlin's testimony, defense counsel moved for a dismissal, alleging a discovery violation. The defense stated that he never received any reports indicating that Haywood was an eyewitness. The State argued that defense counsel knew Haywood was present at the shooting, thus he could infer that Haywood was an eyewitness. Moreover, the State did not even learn that McLaughlin knew Haywood was an eyewitness until it was about to put her on the stand.

The trial judge denied the motion for dismissal. However, the judge stated that he would grant a motion for mistrial and would immediately begin picking another jury, if the defense wanted to make the motion. Defense counsel then conferred with the defendant and explained what declaring a mistrial might mean to his case. The defense decided to continue the trial.

The next witness for the State was Helen Richardson, the victim's niece. She testified that on October 18, 1985, at approximately 2:30 p.m., she was on the back porch of 2347 W. Adams, a building located across the street from the site of the shooting. She went to the store, and on her way saw the victim arguing with the defendant. She returned to 2347 W. Adams, and at approximately 3 p.m., she heard a gunshot. She looked across the street and saw the defendant run past her wearing blue jeans and a vest, and carrying a cowboy hat. On cross-examination, Richardson stated that she never saw the defendant with a shotgun and she did not see the defendant shoot the victim.

Jackie Davis also testified for the State as an eyewitness. He was in the lobby of 2417 W. Adams on October 18, 1985, when the shooting occurred. He heard the victim and the defendant arguing. The victim said, "Go on, man. I got enough on my mind already." The defendant replied, "I am the Duke nigger," raised his shotgun, and shot the victim from six feet away, before running off. Davis, Haywood and Kevin Chester then picked the victim up and began walking toward Davis' car. The defendant returned, so they put the victim back down on the sidewalk and ran. When the defendant left the second time, they took the victim to the hospital.

At the hospital, Davis talked with several police officers, but de-

nied seeing anything because he was scared. Approximately one week after the shooting, he talked to detectives and told them what happened. A month later, Davis went to the police station to look at photographs and identified the defendant as the killer. He also viewed a police lineup in January 1986, and again identified the defendant as the killer.

The shooting was also witnessed by Kevin Chester. Chester testified that he was in the lobby of 2417 W. Adams on October 18, 1985, from 2:30 p.m. until he took the victim to the hospital. He saw the defendant and the victim talking, but could not hear what they were saying. Chester then saw the defendant pull a sawed-off shotgun out of his coat, shoot the victim, and walk out of the building. Chester, Davis and Haywood then grabbed the victim and began carrying him to a car. The defendant returned, so they put the victim down and ran off. They came back a few seconds later, after the defendant had walked away again, and took the victim to Cook County Hospital.

Chester testified that he talked with detectives at the hospital, but did not tell them what happened because he did not want to get involved. Approximately five days after the killing, Chester went to the police station and told the officers what had happened. Chester was shown a picture of the defendant, whom he identified as the killer. Three months later, Chester viewed a police lineup and again identified the defendant as the killer.

Michael Cronin, a Chicago police officer, testified that he was on duty on January 7, 1986, and was sent to 2008 W. Warren in connection with the Battle homicide. He entered the bedroom of a basement apartment and discovered the defendant hiding under a bed. The defendant was then arrested and was given his *Miranda* warnings. On the way to the police station, Cronin asked the defendant if he wanted to give up the gun that he had used in the murder. The defendant said that he did not know where the gun was because he threw it away when he ran from the shooting. Cronin also asked him what the shooting was about and the defendant responded, "You got to do what you got to do." When Cronin arrived at the police station, he searched the defendant and found a bus ticket from Milwaukee, Wisconsin. Cronin questioned the defendant concerning the bus ticket, and the defendant told Cronin that he had just returned from Milwaukee that day because he was tired of running from the police.

Following the direct examination of Cronin, the State made a motion *in limine* to preclude the defense from asking whether a written statement was taken from the defendant. In the alternative, the State asked to be allowed to bring in testimony that the defendant was pre-

pared to make a written statement, but defendant's attorney telephoned and asked the officers not to question the defendant until he arrived, and after defense counsel conversed with the defendant, the defendant refused to speak to the officers.

The defense responded that if he could not question Cronin concerning the absence of a written statement, he would have to withdraw from the case and testify as a witness. Defense counsel would have to testify that when he spoke with the officers on the telephone, he was informed that no statement had been taken and that no lineup had been conducted, when in fact the defendant had already made an oral statement and a lineup had already been conducted.

Defense counsel conferred with the defendant concerning the motion *in limine* and whether he should withdraw as counsel. The State and defense then agreed that the defense counsel could ask Cronin if his investigation of the defendant terminated at the police station and whether Cronin asked the defendant to make a formal written statement of what the defendant had just told him. Cronin then testified on cross-examination that he did not make a formal written statement of what the defendant told him.

Following Cronin's testimony, the State rested its case. The State and the defense then stipulated that Officer Bolling would testify that one of the witnesses at Cook County Hospital gave the name Jessie Davis and that Jessie (Jackie) Davis and David Haywood told him that they entered the breezeway of the building and discovered the victim. The parties also stipulated that if Detective Thomas testified, he would state that he was McLaughlin's partner on October 18, 1985, and that Helen Richardson never told him that she saw the defendant with the victim at 2:30 p.m. on October 18.

The defense then called the defendant to the stand. The defendant denied making the statements that Officer Cronin testified the defendant had made. The defendant also denied shooting the victim. The defendant admitted that he had previously been convicted of unlawful use of a weapon and that the weapon involved in that conviction was a shotgun. On cross-examination, the defendant admitted that he was in Milwaukee from October 18, 1985, until January 7, 1986, but denied that he was in Milwaukee because he was running from the police. Following cross-examination of the defendant, the defense rested.

The trial jury found the defendant guilty of murder. The defense presented post-trial motions, which the trial court denied. The trial court then entered judgment on the verdict.

At the defendant's sentencing hearing, the trial court refused the

State's request to impose an extended-term sentence, but the court sentenced the defendant to 40 years in the Illinois Department of Corrections, the maximum statutory sentence, and to three years' mandatory supervised release. The trial court based its sentence on the following factors: the defendant's conduct had caused serious harm; the defendant had a prior criminal history; the defendant was on probation for a felony when he shot the victim; the defendant's prior felony also involved use of a shotgun; and the sentence was necessary to deter similar conduct in others. The court stated that the defendant was "a coldblooded killer who deserve[d] to be locked up for a very substantial period of [his] life." Following his sentencing, the defendant appealed to this court.

Defendant's first issue on appeal is that he was denied effective assistance of counsel because his trial attorney, Mr. Cohen, did not withdraw as his counsel in order to testify at defendant's trial. Defendant claims that Cohen should have testified that following defendant's arrest, he telephoned the police station and was told that the defendant had not given a statement yet and that no police lineup had taken place, when in fact both had already occurred.

■■ ■ In judging an ineffective assistance of counsel claim, the benchmark is whether the attorney's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984), 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064.) The *Strickland* analysis involves a two-step inquiry. The defendant must show that his attorney's specific acts or omissions to act fell below the standard of reasonable professional judgment. (*Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) The reasonableness of an attorney's action is determined in light of the facts of the particular case, viewed not in hindsight, but as of the time of the conduct. (*Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *People v. Spicer* (1987), 163 Ill. App. 3d 81, 93, 516 N.E.2d 491, 500, *appeal denied* (1988), 119 Ill. 2d 571, 522 N.E.2d 1254.) There is a presumption that counsel has provided adequate assistance and has exercised reasonable professional judgment. *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *Spicer*, 163 Ill. App. 3d at 93, 516 N.E.2d at 499.

■ Even if a defendant can show that his attorney acted below the standard of reasonableness, he cannot succeed in an ineffective assistance of counsel claim unless he can prove to a reasonable probabil-

ity that, but for his attorney's errors, the outcome of his case would have been different. (*Strickland,* 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *Albanese,* 104 Ill. 2d at 525, 473 N.E.2d at 1255.) In making this determination, a reviewing court must consider all of the evidence that was before the judge and jury. *Strickland,* 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069; *People v. Mitchell* (1984), 105 Ill. 2d 1, 15, 473 N.E.2d 1270, 1277, *cert. denied* (1985), 470 U.S. 1089, 85 L. Ed. 2d 153, 105 S. Ct. 1857.

▮ The specific act upon which defendant bases his ineffective assistance claim was Cohen's failure to withdraw as counsel and testify in his case. Defendant claims that Cohen's failure to testify deprived him of impeaching evidence that would have rebutted the "devastating" testimony of Officer Cronin. The alleged impeaching evidence was that Cohen was erroneously informed that defendant had not given a statement and that no lineup had been conducted. Defendant argues that Cohen should have testified to this misinformation in order to impeach Cronin's testimony concerning his conversation with defendant. According to defendant, had this impeaching evidence been introduced, there is a reasonable probability that he would have been found not guilty. The State contends that Cohen's performance was more than competent and that there is no evidence that the trial attorney's testimony could have been used as impeachment.

▮ We find no evidence to support defendant's claim of ineffective assistance of counsel. As the State observes, there is no evidence in the record that Officer Cronin was the officer who told defendant's attorney that no statement had been made and that no lineup had been conducted. In fact, the evidence showed that Cronin's involvement with defendant ended when he brought the defendant to the police station. Since Cronin was not the police officer who gave Cohen the erroneous information, Cohen's testimony could not have been used to impeach him. Furthermore, the record reveals that Cohen's decision not to testify was a strategical decision, reached after Cohen had consulted with defendant. A claim of incompetency based on a matter of trial tactics or strategy, or in the exercise of judgment or discretion, is insufficient to support a claim of ineffective assistance. *People v. Shum* (1987), 117 Ill. 2d 317, 370, 512 N.E.2d 1183, 1205, *cert. denied* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108 S. Ct. 1060; *Mitchell,* 105 Ill. 2d at 12, 473 N.E.2d at 1275.

We also note that even if Cohen's failure to testify amounted to incompetence, which it did not, defendant would not have prevailed on his ineffective assistance claim because he would have been unable to show how he was prejudiced by Cohen's failure to testify. Defend-

ant gave his oral statement to Cronin after he had received his *Miranda* warnings. Defendant does not challenge the sufficiency of these warnings; accordingly, defendant's waiver of his right to remain silent was valid. The fact that Cohen telephoned and was informed that no statement had been made had no bearing on the validity of defendant's waiver of his right to remain silent and on the validity of his statement. (See *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135; see also Note, *Moran v. Burbine: Supreme Court Tolerates Police Interference with the Attorney-Client Relationship*, 18 Loy. U. Chi. L.J. 251 (1986).) Cohen's testimony could not have been used to exclude Cronin's testimony concerning defendant's admissions; thus, we cannot say that Cohen's testimony would have produced a different result in this case.

Defendant's second issue on appeal is that his conviction should be reversed because he was unaware that one of the State's witnesses, McLaughlin, would testify that Haywood was an eyewitness to the shooting. Defendant claims that this was a discovery violation which severely prejudiced him in presenting his defense. The State contends that there was no discovery violation, that any sanction was in the trial court's discretion, that the defendant was not prejudiced by the testimony, and that the issue has been waived on review.

At the outset, we find that the defendant has waived this issue for purposes of review. Courts will deem objections to undisclosed testimony waived for purposes of review if the defendant does not request a continuance in order to investigate the testimony. (*People v. Jones* (1983), 119 Ill. App. 3d 615, 625, 456 N.E.2d 926, 934.) Furthermore, absent a showing of surprise or prejudice to the defendant, the trial court has the discretion to admit the undisclosed testimony. (*People v. Williams* (1985), 137 Ill. App. 3d 736, 743, 484 N.E.2d 1191, 1196; *Jones*, 119 Ill. App. 3d at 625, 456 N.E.2d at 934.) A defendant cannot claim surprise or prejudice if he does not seek a continuance to interview the witness, and any objection to the testimony based on a claim of surprise or prejudice is also waived on review. (*Jones*, 119 Ill. App. 3d at 625, 456 N.E.2d at 634-35.) In the present case, after McLaughlin revealed the undisclosed testimony, defendant requested a dismissal, but did not seek a continuance in order to investigate the testimony. Hence, defendant has waived this issue on review.

Even if defendant had preserved his objection to McLaughlin's testimony, we conclude that the trial court did not abuse its discretion in admitting the testimony. Concededly, a discovery violation did occur in this case because we have held that the State has

failed to exercise due diligence in conducting discovery when it fails to discover a statement made to law enforcement personnel or officers, because that information is considered to be within the State's possession and control. (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 838, 447 N.E.2d 1029, 1045.) In the present case, although the State did not know of Haywood's statement until McLaughlin was about to testify, McLaughlin was a law enforcement officer; hence, we find that the statement was under the State's possession and control.

However, it is within the trial court's discretion to determine the appropriate sanction for a discovery violation and a reviewing court will accord the trial judge's decision great weight. (*People v. Morgan* (1986), 112 Ill. 2d 111, 135, 492 N.E.2d 1303, 1312, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329.) In the present case, the trial judge denied the defendant's request for a dismissal, but offered to declare a mistrial. Defendant and his attorney discussed whether to move for a mistrial, which is a drastic sanction (*Morgan*, 112 Ill. 2d at 135, 492 N.E.2d at 1312), and declined it. Since defendant failed to seek a continuance and declined to move for a mistrial, he cannot now claim that this discovery violation severely prejudiced him in presenting his defense. For these reasons, we find that the discovery violation did not amount to reversible error.

The next issue that the defendant raises on appeal is that the State did not prove him guilty of murder beyond a reasonable doubt. Defendant bases this contention on the inconsistent statements that the eyewitnesses gave to the investigating officers and the discrepancies between the statements of the eyewitnesses. The State argues that the evidence in the case overwhelmingly proves the defendant guilty beyond a reasonable doubt.

A reviewing court will not set aside a criminal conviction unless the evidence is such that it creates a reasonable doubt as to the defendant's guilt. (*People v. Adams* (1985), 109 Ill. 2d 102, 115, 485 N.E.2d 339, 342, *cert. denied* (1986), 475 U.S. 1088, 89 L. Ed. 2d 730, 106 S. Ct. 1476; *People v. Taylor* (1987), 164 Ill. App. 3d 938, 943, 518 N.E.2d 409, 412, *appeal denied* (1988), 119 Ill. 2d 572, 522 N.E.2d 1254.) A jury's verdict should be set aside only if the evidence, viewed in a light most favorable to the prosecution, is so improbable, unsatisfactory or inconclusive that a trier of fact could not find a defendant guilty beyond a reasonable doubt. (*People v. Jarvis* (1987), 158 Ill. App. 3d 415, 425, 511 N.E.2d 813, 819, *appeal denied* (1987), 117 Ill. 2d 549, 517 N.E.2d 1091.) The trier of fact is in the best position to judge the credibility of witnesses, the weight to be accorded their testimony, and to draw inferences from the testimony.

*Jarvis,* 158 Ill. App. 3d at 425, 511 N.E.2d at 819.

■■■ Viewing the evidence in this case in a light most favorable to the prosecution, as we must, we find that the evidence was sufficient to convict the defendant of murder beyond a reasonable doubt. The statements of the eyewitnesses in the case differed only on minor details, such as whether the defendant was wearing a cowboy hat or not. A reasonable doubt is not created by minor inconsistencies or conflicting testimony. (*Adams,* 109 Ill. 2d at 115, 485 N.E.2d at 343; *People v. Cooper* (1987), 164 Ill. App. 3d 734, 737, 518 N.E.2d 260, 262.) Additionally, all the eyewitnesses admitted in their testimony that they did not initially tell the police officers that they witnessed the shooting and explained that they were silent because they were afraid. This testimony, viewed in a light most favorable to the prosecution, is not so improbable that it creates a reasonable doubt concerning defendant's guilt. In addition to the testimony of the eyewitnesses, the case against the defendant is strengthened by the defendant's statements to Officer Cronin, including his statement that he had been in Milwaukee since the shooting and had returned because he was tired of running from the police. Accordingly, there was sufficient evidence to prove the defendant guilty of murder beyond a reasonable doubt.

Defendant's final issue on appeal is that his sentence is excessive and should be vacated and remanded for a new sentencing hearing. The defendant claims that the trial court improperly considered, as a factor in aggravation, the fact that defendant's conduct caused serious harm. The State argues that the judge properly considered the totality of aggravating factors in sentencing the defendant and did not abuse his discretion.

■■■ ■ A sentence alleged to be excessive, even though it is within statutory limitations, will not be disturbed on review unless it is grossly disproportionate to the nature of the offense. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 493, 508 N.E.2d 708, 716, *cert. denied* (1987), 484 U.S. 929, 98 L. Ed. 2d 257, 108 S. Ct. 297.) The trial judge is accorded discretion in imposing a sentence because he is normally in a better position to determine the appropriate punishment than the reviewing court. (*Cabrera,* 116 Ill. 2d at 494, 508 N.E.2d at 716.) A judgment as to the appropriate sentence depends on the facts of each case, considering such relevant factors as the defendant's age, demeanor, mentality, habits, general moral character, credibility, and social environment, along with the nature and circumstances of the offense. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 268, 497 N.E.2d 1138, 1143.) Even if a judge relies on an improper factor in sentenc-

ing, the sentence will be affirmed if the record shows that the weight placed on the improper factor was so insignificant that it did not lead to a greater sentence. *People v. White* (1986), 114 Ill. 2d 61, 67, 499 N.E.2d 467, 469.

The defendant contends that the trial judge improperly considered that the defendant's conduct caused serious harm because serious harm is implicit in the crime of murder. Defendant cites *People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906, to support his claim that when a judge considers, in aggravation, a factor that is implicit in the crime for which he is charged, the sentence must be vacated and remanded for resentencing. In *Conover*, the Illinois Supreme Court vacated and remanded a defendant's sentence for burglary because the trial judge considered, as a factor in aggravation, that the defendant received compensation as a result of the burglary. (*Conover*, 84 Ill. 2d at 405, 419 N.E.2d at 909.) The supreme court held that a trial court could consider the receipt of compensation in aggravation only when a defendant is paid to commit a burglary or theft. (*Conover*, 84 Ill. 2d at 405, 419 N.E.2d at 909.) The *Conover* court remanded the defendant's case for resentencing because it could not determine how much weight the trial court accorded the improper factor. *Conover*, 84 Ill. 2d at 405, 419 N.E.2d at 909.

Since the *Conover* case was decided, the Illinois Supreme Court has considered whether inflicting serious bodily harm is implicit in the crimes of involuntary and voluntary manslaughter and, thus, is an improper factor for a trial court to consider in aggravation. In *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, the court stated:

> "While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted.*" (Emphasis in original.) (*Saldivar*, 113 Ill. 2d at 269, 497 N.E.2d at 1143.)

Specifically, the court held that in voluntary manslaughter cases, a trial court could consider the force that the defendant used and the physical manner in which the defendant brought about the victim's death, when applying in aggravation the fact that the defendant's conduct caused serious harm. (*Saldivar*, 113 Ill. 2d at 271, 497 N.E.2d at 1144.) The defendant's sentence in *Saldivar* was modified, however, because the trial judge had focused on the fact that the conduct causing serious harm resulted in the victim's death, a factor im-

plicit in a charge of voluntary manslaughter. (*Saldivar*, 113 Ill. 2d at 272, 497 N.E.2d at 1144.) It was apparent, however, that the sentence would have been affirmed if the judge had focused on the force employed and on the physical manner in which the victim was killed.

In *People v. Martin* (1988), 119 Ill. 2d 453, 455, 519 N.E.2d 884, 885, the defendant was sentenced to five years in prison, the statutory maximum for involuntary manslaughter. In aggravation, the trial court considered that the defendant's conduct caused serious harm to the victim, resulting in the victim's death. (*Martin*, 119 Ill. 2d at 455, 519 N.E.2d at 885.) In addition, the victim's death was a substantial factor considered by the judge in sentencing the defendant to the maximum penalty. (*Martin*, 119 Ill. 2d at 461, 519 N.E.2d at 888.) Therefore, the Illinois Supreme Court remanded for resentencing, finding that the trial court had improperly focused on the victim's death, rather than on any force or brutality that the defendant might have used in causing the victim's death. *Martin*, 119 Ill. 2d at 461, 519 N.E.2d at 888-89.

In the present case, when sentencing the defendant the trial judge said, "[T]he defendant's conduct caused serious harm. The most serious fatality. That is a factor in aggravation which the Court must consider in imposing a more severe sentence." We find that the statement, "The most serious fatality," reveals that the judge was improperly focusing on the fact that the defendant's conduct resulted in the victim's death, rather than focusing on the manner in which the defendant shot the victim and on the amount of force used. Applying the reasoning in *Saldivar* and *Martin*, we find that this factor was improperly considered, because death is implicit in the offense of murder.

However, we conclude that it is not necessary to vacate the defendant's sentence and remand for resentencing. Although the trial court improperly considered the victim's death as a factor in aggravation, the court did not rely on this factor alone in sentencing the defendant. Instead, the court focused on several factors in imposing the defendant's sentence. Among these factors were the defendant's prior criminal activity, the fact that the defendant was on probation when he committed the murder, and the need to deter others from similar conduct. The court placed greatest emphasis on the defendant's prior criminal activity and his violation of probation, stating:

> "This Court finds that an overwhelming number of the statutory criteria calling upon a more severe sentence are present. The defendant violated his probation in a manner that is in the worst possible way. He went back and got a sawed off shotgun.

The same sort of thing that he'd done before only this time instead of merely possessing that sawed off shotgun he killed." Based on the record, we find that the weight placed on the improper factor, the victim's death, was insignificant and did not lead to the imposition of a greater sentence. Moreover, the testimony showed that the defendant shot the 17-year-old unarmed victim at close range with a shotgun and then just walked away. Given the callous nature of the crime, the defendant cannot claim that his sentence is grossly disproportionate to the nature of the offense.

Accordingly, for all of the foregoing reasons, we affirm defendant's conviction and sentence.

Affirmed.

MANNING and O'CONNOR, JJ., concur.