(No. 59138.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ULECE MONTGOMERY, Appellant.

*Opinion filed April 4, 1986.—Rehearing denied June 30, 1986.*

520

SIMON, J., concurring in part and dissenting in part.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago

(Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry and Inge Fryklund, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Ulece Montgomery, was indicted by a Cook County grand jury for the murders of two elderly women. In a stipulated bench trial he was found guilty as charged. Following a hearing before the trial judge defendant was sentenced to death. He appeals directly to this court, as a matter of right, pursuant to article VI, section 4(b), of the 1970 Illinois Constitution (Ill. Const. 1970, art. VI, sec. 4(b)). See also Ill. Rev. Stat. 1983, ch. 38, par. 9—1(i); 87 Ill. 2d R. 603.

Defendant raises three issues relating to his conviction: (1) Was there probable cause for the defendant's two arrests? (2) Were defendant's statements after his second arrest the product of the police confronting him with illegally obtained evidence? and (3) Did the trial court rely upon improper impeachment in rejecting defendant's suppression-hearing testimony? In addition, defendant raises five issues with regard to his sentencing: Did the trial court (1) improperly fail to consider, in mitigation, evidence of defendant's "horrendous" youth; (2) improperly fail to consider, in mitigation, evidence that defendant acted under "extreme mental or emotional disturbance"; (3) improperly fail to consider, in mitigation, evidence of defendant's potential for rehabilitation; or (4) give undue weight to double hearsay allegations of earlier sexual assaults by defendant? and (5) Was the trial court's finding that death was the appropriate penalty against the manifest weight of the evidence? Finally, defendant claims that the Illinois death penalty statute is unconstitutional because (1) it gives the State unbridled discretion to determine whether a death penalty hearing will be held, (2) it fails to provide for pro-

portionality review, (3) the sentencing court is not required to make written findings as to the existence of aggravating and mitigating factors, (4) it places the risk of nonpersuasion at sentencing on the defendant, and (5) it requires a finding that death is appropriate whenever aggravation outweighs mitigation.

Late in the evening of April 25, 1981, police from the Robbins police department and the Cook County sheriff's police were called to investigate a double homicide in Robbins. Two elderly women were apparently raped and strangled in their apartments in a two-flat building owned by the two victims. Although the women were not shot or knifed, there nonetheless was blood on the bodies coming from each victim's nose and mouth. There was no sign of forced entry into either apartment.

According to suppression-hearing testimony defendant walked his bicycle up to the scene sometime after the police arrived. Although the testimony was conflicting, apparently defendant asked the police some questions about what was happening. In response to Officer Houlihan's inquiry defendant replied that he lived in the apartment behind the victims' two-flat, in a sort of coachhouse on the same lot as the two-flat. Officer Houlihan testified that defendant had scrapes on his hands and spatters of blood on his pants. Defendant responded to an inquiry about the blood and scrapes by claiming that he had cut himself while attempting to repair his bicycle.

The testimony was conflicting as to what happened next. Officer Houlihan claimed that he asked if defendant would go with him to the police station to answer some questions. Houlihan also testified that he asked if defendant would mind waiting for a while in a squad car while he finished investigating the scene. Defendant testified that he was not asked but, instead, told that he was to accompany the officers to the station, and that he

was also told, not asked, to wait in the squad car. Defendant testified that once in the squad car there was no way to get out because the back seat was caged off from the front and the doors had no inside handles. Once at the station, defendant testified, he was locked in an interrogation room. Officer Houlihan testified that defendant was not locked in the room and was free to leave at any time.

During the time defendant spent at the police station on the evening of April 25 and early morning of April 26 defendant signed a written consent form allowing the police to take his fingerprints and palm prints, samples of his head and pubic hair, pubic hair combings, and fingernail scrapings. The police obtained the evidence stated in the consent form and also confiscated defendant's blood-spattered clothing. Defendant was then released.

Two days later, on April 27, 1981, Officer Houlihan received word that defendant's finger and palm prints had been matched to latent prints found on one of the victim's eyeglasses and on an eyeglass case found in that victim's apartment. Armed with this information Officer Houlihan and two other policemen went to defendant's apartment, although they did not have a warrant. The officers testified that they arrested defendant outside his home, although defendant testified that they pushed open the front door, dragged him outside, and then arrested him.

Defendant was then taken to a nearby police station, where he was informed of the fingerprint match. Within 20 minutes of the arrest at his home defendant made the first of three confessions.

Defendant filed several suppression motions, all of which were denied. The trial court ruled that defendant had in fact been arrested on April 25 but found that there was adequate probable cause for the arrest. The

court also found that the second arrest, on April 27, was supported by probable cause, and found that the arrest had taken place outside defendant's home, obviating the requirement of a warrant. The court thus found that defendant's fingerprints and confessions were properly obtained and therefore admissible as evidence.

There is sufficient evidence to support the trial court's finding that defendant was arrested on the evening of April 25, 1981. Since this arrest was without a warrant, it was a valid arrest only if it was supported by probable cause. (*Beck v. Ohio* (1964), 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225; *People v. Tisler* (1984), 103 Ill. 2d 226, 236-37.) Probable cause exists when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. (*Dunaway v. New York* (1979), 442 U.S. 200, 208 n.9, 60 L. Ed. 2d 824, 833 n.9, 99 S. Ct. 2248, 2254 n.9; *Beck v. Ohio* (1964), 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225; *People v. Tisler* (1984), 103 Ill. 2d 226, 237.) Whether probable cause is present is governed by common-sense considerations (*Brinegar v. United States* (1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310; *People v. Tisler* (1984), 103 Ill. 2d 226, 236), and the calculation concerns "[t]he probability of criminal activity, rather than proof beyond a reasonable doubt." *People v. Tisler* (1984), 103 Ill. 2d 226, 236.

In the case at bar, the circumstances, taken as a whole, support the trial court's ruling that there was probable cause for the April 25 arrest. By the time defendant arrived at the crime scene the police had determined that the murderer had not forced entry into either victim's apartment. It was thus likely that the assailant was known to the victims. When defendant appeared, police discovered that he lived on the victims'

property, in the unattached rear apartment. He had spatters of blood on his pants, which were consistent with the fact that blood was found on the victims, and his hands were scraped, consistent with the signs of struggle in the victims' apartments. Given these circumstances the police were able to determine that defendant was part of a relatively small class of people who could have had the opportunity to commit the murders, and shortly after the murders defendant's physical appearance was both highly unusual and consistent with his having committed the crimes. Defendant's explanation for his appearance—that he had hurt himself fixing his bicycle—was not inherently implausible but was insufficient to allay the strong probabilities created by the other facts known to the police.

Since the April 25 arrest was supported by probable cause, defendant's person was subject to a full search incident to this arrest. (*United States v. Robinson* (1973), 414 U.S. 218, 235, 38 L. Ed. 2d 427, 441, 94 S. Ct. 467, 477; *People v. Seymour* (1981), 84 Ill. 2d 24, 33-34.) The taking of fingerprints is a relatively unintrusive part of such a search, and thus we are in agreement with the numerous courts which have held that fingerprints may be taken as part of a search incident to a valid arrest. (See, *e.g., United States v. Whitfield* (E.D. Pa. 1974), 378 F. Supp. 184, 187; *Paulson v. Florida* (S.D. Fla. 1973), 360 F. Supp. 156, 161; *Floyd v. State* (1983), 278 Ark. 342, 344-45, 645 S.W.2d 690, 692; *People v. Solomon* (1969), 1 Cal. App. 3d 907, 910, 82 Cal. Rptr. 215, 217; *Brown v. State* (Ind. 1982), 442 N.E.2d 1109, 1116; *State v. Hunter* (Mo. App. 1981), 625 S.W.2d 682, 684.) Therefore defendant's fingerprints were lawfully obtained and properly admitted into evidence.

Since defendant's fingerprints were lawfully obtained, his claim that the second arrest was without probable cause must fail. At the time of the second arrest the po-

lice, in addition to the knowledge supporting the first arrest, had properly obtained the knowledge that defendant's fingerprints had been matched to latent prints found at the murder scene. The second arrest was therefore supported by probable cause.

Defendant also argues that his confessions after the second arrest were involuntary because they were the product of the police confronting him with the fingerprint evidence. Since we hold that the fingerprints were lawfully obtained, this argument must also fail.

Defendant also argues that his warrantless second arrest must be quashed since the police arrested him inside his home in violation of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. Although the trial court specifically found that defendant was arrested outside his home, defendant argues that the trial court, in making this finding, relied upon an improperly admitted statement which impeached defendant's suppression-hearing testimony. At the suppression hearing defendant claimed that the police officers pushed open the door of his home and dragged him outside. The State introduced, as impeachment, a prior statement by defendant which could be interpreted as an admission that defendant was outside his home when the police arrived. Relying on *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967, defendant argues that impeaching him with a prior inconsistent statement denies him his constitutional right to testify at a suppression hearing.

In *Simmons* the Supreme Court held that a defendant's testimony in support of a suppression motion may not be admitted at trial on the issue of guilt. (390 U.S. 377, 394, 19 L. Ed. 2d 1247, 1259, 88 S. Ct. 967, 976.) The *Simmons* court reasoned that a defendant cannot be forced to forgo his right to challenge an unconstitutional seizure of evidence by the threat that his testimony

could subsequently be used against him at trial. (390 U.S. 377, 394, 19 L. Ed. 2d 1247, 1259, 88 S. Ct. 967, 976.) This reasoning has no relevance to the case at bar. Defendant's prior statements were not made in support of a suppression motion but, instead, were voluntarily made in response to police interrogation. As such the statements, if relevant, would be substantively admissible at trial, and we see no reason why they should not be admissible at a suppression hearing. *Simmons* simply cannot be read as allowing a defendant to testify at a suppression hearing without fear of impeachment. Thus, the trial court's finding that defendant was arrested outside his home was not based upon improper evidence, nor is it against the manifest weight of the evidence. We will, therefore, not disturb that finding.

Following the denial of defendant's suppression motions defendant proceeded to a stipulated bench trial, properly waiving his right to a jury and his right to confront and cross-examine witnesses. He was found guilty on six counts of murder. Defendant does not allege error with regard to this trial other than the objections to the evidence discussed above. Since we reject those objections we therefore affirm defendant's convictions.

Defendant also waived a jury for sentencing, and the required hearing (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d)) was conducted before the trial court. The parties stipulated to the use of the trial evidence in aggravation. This evidence included defendant's confession describing the rape and murder of each victim. Based upon the trial evidence the court found the existence of two statutory aggravating factors: (1) the murder of more than one individual (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)) and (2) intentional murder during the course of a rape (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)).

The State then proceeded to introduce further non-statutory aggravating evidence. Three certified state-

ments of conviction were introduced, showing one conviction for contributing to the sexual delinquency of a minor and two convictions for possession of a stolen motor vehicle. The State also called as a witness Lynn Rosiejka, a social worker who had interviewed defendant's mother in 1976 at the time of his conviction for contributing to the sexual delinquency of a minor. Defendant objected to the hearsay nature of Rosiejka's testimony, but the objection was overruled. Rosiejka testified that defendant's mother told her that defendant's conviction arose out of an incident where defendant, then age 19, twice raped his half-sister Jean. Jean was 11 years old at the time. Rosiejka also testified that defendant's mother told her that six years earlier defendant had raped his half-brother Eugene, and one year prior to that had attempted to rape his sister Rene. According to defendant's mother, defendant, by age 19, carried guns and a butcher knife on his person and had once stabbed someone but "got away with it."

Defendant called his mother, who testified that while defendant had raped Jean he had not raped or attempted to rape Eugene or Rene. She did not remember making a contrary statement to Rosiejka but explained that, if she did, it was because she realized defendant needed help and was trying to convince the authorities to provide such help.

Defendant's mother also detailed defendant's troubled youth and was corroborated in this regard by defendant's two aunts. Defendant's early family life included continuous fighting between an alcoholic mother and a drug-addicted father. During this early period defendant and his mother occasionally were forced to temporarily move to this aunt's house to avoid his abusive father. Eventually defendant, his mother, and his siblings were forced to permanently move away from defendant's father.

Following this period defendant became increasingly difficult to control. From about age 10 to 14 defendant spent much of his time living on the street, sleeping in abandoned cars and buildings. At other times he lived with his aunts, in a foster home, and at the Audy Juvenile Home. His mother, during this time, was an alcoholic who frequently failed to take care of her children. Defendant also began to drink heavily at age 14.

Defendant's sister Jean, called on his behalf, testified that, while she had been raped, defendant had not hurt her. Eugene and Rene testified and denied that defendant had ever sexually assaulted them.

Defendant called, as an expert witness, Dr. Stephen Porter. Dr. Porter, a psychiatrist whom defendant had retained, testified that his diagnosis was that defendant was a chronic alcoholic and drug abuser, and had an antisocial personality disorder. In Dr. Porter's opinion, at the time of the offense defendant's judgment and intellect were significantly impaired by defendant's use of alcohol and drugs on the day of the crime, combined with defendant's emotional problems. In Dr. Porter's opinion defendant committed the crime under "extreme mental or emotional disturbance."

Defendant also called Dr. Albert Stipes, a psychiatrist who had interviewed defendant at the State's request. Dr. Stipes testified that he agreed with Dr. Porter in all essential respects. Dr. Stipes, however, refused to give any opinion on whether defendant acted under "extreme mental or emotional disturbance" because "they are not really medical terms that I would use."

Defendant also called Douglas Meyer, a Lutheran pastor who had met several times with defendant while defendant was imprisoned. Meyer's testimony was offered to show defendant's potential for rehabilitation. Meyer testified that defendant showed an increasing "religious dimension." When asked whether defendant could

be rehabilitated Meyer testified:

"As a Lutheran Minister I would have to say I believe God can certainly touch many lives and it is not something for us to decide who God can turn around and who God cannot. With the hope or possibility of grace I think Mr. Montgomery indicates an acceptance of the possibility of being turned around and he has certainly told me about the possibility of the future.

He has talked to me about the fact he likes to work with his hands. He has talked about the meaning of that. He would like to be a mechanic, doesn't aspire to being a Doctor or lawyer. I think that is certainly promising.

Certainly, no one can say, but the State, if he is rehabilitated."

Defendant's first argument with regard to sentencing was that the trial judge failed to consider defendant's troubled youth as a mitigating factor, in violation of *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869. We disagree. The record shows that the trial court specifically considered defendant's childhood. In his oral findings the trial judge stated:

"I don't know that the defendant's family has been the worst family. He has been fortunate to have not only his mother, his brother and sister, but his aunts and I sympathize with his good family.

As it was said a wise child is a blessing to his father, but a foolish child is a burden to his mother.

The family has had some of its problems. I don't suppose they are the only family that have problems on occasion, but it is not as if the defendant was kicked out on the street at the age of seven and left to shift for himself.

So, it isn't as if nobody tried to help him. A lot of people tried to help him.

My heart does go out to his good mother."

Similarly, we reject defendant's contention that the trial court violated *Eddings* and section 9—1(c)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par.

9—1(c)(2)), in failing to consider as a mitigating factor the fact that defendant acted "under the influence of extreme mental or emotional disturbance." The trial court, in its findings, stated:

"I must also congratulate the Psychiatrist [*sic*] for giving an honest opinion for what weight, of course, may be given to their opinions and to their determinations, but I think to their credit they testified with an honest opinion and did not try to fabricate or manufacture a stereotype defense that is on occasion presented by experts, who—whose opinions are strictly for hire.

* * *

The evidence does not really establish what the law describes as extreme mental or emotional disturbance and the experts aren't, even in this case, aren't even certain on that and perhaps he was drinking voluntarily, I might add."

We need not decide whether or not the statutory factor was established because the above statement demonstrates that the psychiatric evidence was in fact considered.

Defendant also argues that the trial court failed to consider evidence of defendant's potential for rehabilitation. The sole evidence of potential rehabilitation was the noncommittal testimony of Douglas Meyer. Meyer testified that he did not know whether or not defendant could "turn around," concluding that "no one can say, but the State, if.he is rehabilitated." It was not against the manifest weight of the evidence for the trial court to find that Meyer's testimony was not clear evidence of rehabilitative potential.

Defendant also argues that the trial court incorrectly credited Lynn Rosiejka's hearsay testimony regarding the alleged prior sexual assaults. However, evidence which is inadmissible at trial may properly be allowed at a death penalty hearing to prove the existence of nonstatutory aggravating factors. (Ill. Rev. Stat. 1983, ch.

38, par. 9—1(e).) The determination of admissibility depends upon the relevance and reliability of the proffered evidence and is discretionary with the trial court. (*People v. Davis* (1983), 95 Ill. 2d 1, 43.) We cannot say that the court here abused that discretion.

The hearsay nature of Rosiejka's testimony went to the weight of the evidence, not its admissibility. Defendant's own witness, his half-sister Jean, confirmed that she had been raped, and the State introduced a certified conviction arising out of the incident. In view of this corroboration of Rosiejka's testimony we do not believe that the trial court's finding that "defendant has *** a history of sexually aggressive behavior" is against the manifest weight of the evidence.

Defendant also argues that the death penalty is an excessive sentence. The trial court, however, found two separate statutory aggravating factors. The court also found that the crime was heinous, that the defendant had a history of delinquency, criminal and antisocial behavior, and sexual aggression. Given the extreme aggravation and the relative degree of mitigation, we do not believe that the trial court's finding that death was the appropriate penalty was against the weight of the evidence.

Defendant also raises several issues relating to the constitutionality of Illinois' death penalty statute (Ill. Rev. Stat. 1983, ch. 38, par. 9—1). He gives no reasons at all for four of these issues, merely asking that we reconsider our past decisions. This court has held that the discretion granted to the prosecutor to decide whether or not a death penalty hearing is held violates neither the eighth amendment (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 540-43) nor the separation-of-powers doctrine (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 536-40; see also *People v. Silagy* (1984), 101 Ill. 2d 147, 161; *People v. Brownell* (1980), 79 Ill. 2d

508, 527); that the death penalty statute provides for adequate comparative review (*People v. Silagy* (1984), 101 Ill. 2d 147, 161; *People v. Kubat* (1983), 94 Ill. 2d 437, 503-04; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44); and that there is no constitutional or statutory requirement that the sentencing authority make written findings regarding the presence or absence of aggravating and mitigating factors (*People v. Gaines* (1981), 88 Ill. 2d 342, 383; *People v. Brownell* (1980), 79 Ill. 2d 508, 544). We decline the invitation to reconsider those rulings.

Defendant also argues that the death penalty statute is unconstitutional because it places the burden of non-persuasion on defendant. This court rejected a similar argument in *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46, and we continue to adhere to the position stated therein.

Finally, we see no constitutional defect in the statute by virtue of the fact that the death penalty is mandatory whenever there is no mitigating factor or factors sufficient to preclude imposition of the death penalty. (See *People v. Owens* (1984), 102 Ill. 2d 88, 113-14.) A finding that no mitigating factor or factors are sufficient to preclude imposition of the death penalty is synonymous with a finding that death is the appropriate penalty.

For the reasons stated herein, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, September 23, 1986, as the date on which the sentence of death entered in the circuit court of Cook County is to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the insti-

tution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part.

I concur in the majority's decision to uphold the conviction. However, for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part), I believe that the Illinois death penalty statute is unconstitutional and that the death sentence in this case should be vacated.