THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD McCLELLAN, Defendant-Appellant.

First District (3rd Division) No. 1—88—3794

Opinion filed June 30, 1992.—Rehearing denied September 10, 1992.

John L. Conlon, Russell E. Marsh, Kathleen M. Burch, and Jennifer M. Baratta, all of Hopkins & Sutter, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Christine Perille, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant, Richard McClellan, was convicted of voluntary manslaughter and armed robbery, and received extended-term sentences of 60 years for armed robbery and 30 years for voluntary manslaughter to be served concurrently.

On appeal, defendant raises seven issues: (1) the legality of his arrest; (2) the procurement and use of his statements to the police; (3) the flawed jury selection; (4) the admission of certain evidence; (5) the refusal to instruct the jury as to theft; (6) jury verdicts inconsistent or unsupported by the evidence; and (7) the impropriety of the extended-term sentences for both armed robbery and voluntary manslaughter.

For the reasons which follow, we reduce defendant's sentence for voluntary manslaughter to 15 years and affirm the trial court's decisions on the remaining issues.

On October 31, 1986, about 7:30 a.m., a police officer found the body of the victim, Paulette Washington, in an alley directly beneath the open window of the victim's third-floor apartment. The cause of death was subsequently determined to be multiple stab wounds combined with blunt trauma injuries. The officer entered the victim's apartment and found her three minor children, who were taken to the police station.

About 8:30 a.m., Detective David Nowak arrived at the scene to investigate the victim's death. Nowak noticed that the window in the victim's apartment was open, the area around the window was stained with blood, and there were no signs of forced entry. Nowak interviewed several residents of the building, including Lorraine and Charlene Powell, who lived in another apartment on the third floor, Michael and Delores Banks, who lived in a first-floor apartment, and defendant, Delores Banks' nephew, who was staying in the Bankses' apartment.

At this first interview, defendant stated that he was in the Powells' apartment until about 1 a.m., returned to the Bankses' apartment, fell asleep, and woke up about 7 a.m., at which time he learned of the incident. The police did not note any blood on defendant's clothing or any bandages on his hands.

Lorraine and Charlene Powell stated that they were asleep at the time of the incident, but believed that Michael Banks may have been involved because the previous day the victim had allowed the electric company to enter the building and turn off the electricity in two apartments, one of which was the Bankses' apartment.

Detective Nowak located Michael Banks outside the building and took him to the police station for further questioning.

Michael Banks told Nowak that on the night of the incident, he had arrived home about 10 p.m. after having gone to his mother's house to borrow money. He fell asleep watching television and listening to the radio and woke up about 4 a.m. He then observed defendant entering the apartment, returned to bed, and next awoke between 6:30 and 7 a.m.

Banks submitted to a polygraph examination, and the technician who performed the polygraph test opined that Banks had an idea of who committed the crime but did not actually participate in the crime himself.

The investigation of the victim's death continued from November 1 through November 7. During this time, the victim's six-year-old daughter, Alanda, told family members that the person who had hurt her mother sometimes resided in the building and had keys to her mother's apartment.

On the evening of November 7, Michael Banks flagged down a police car and told the officers that he had information about the investigation. Banks was taken to police headquarters where he described the events of the night of the victim's death. Banks said that defendant came into his apartment about 4 a.m. and gave him $50 to buy cocaine. Banks left to obtain the cocaine and when he returned to the apartment, he observed that defendant had a fresh bandage on one of his hands and a reddish-brown stain on one of his shoes. Banks said that he refrained from giving this information to the police earlier because he did not want to admit his involvement in drug use.

The next day Detective Nowak verified this information with Michael Banks and reinterviewed Charlene Powell. Charlene stated that on the night of the incident, defendant was drinking in her apartment until about 3:30 a.m. Defendant asked Charlene to lend him $10 to purchase cocaine. When she refused to loan money to defendant, he left.

On November 9, 1986, around noon, Detective Nowak and his partner went to defendant's grandmother's house, knocked on the front door and defendant's grandmother let the police officers in her apartment, where they found defendant asleep on the couch. Detective Nowak testified that he told defendant he was continuing the investigation and wanted to interview defendant again and that defendant agreed to accompany him to the police station. Defendant was transported to the station in the unmarked detectives' car and was not handcuffed.

Defendant was taken to a windowless interview room which contained a desk and two chairs. After reiterating his original statement, defendant denied asking Charlene Powell for $10 for cocaine and denied giving Michael Banks $50 to buy cocaine. At the request of the police, defendant agreed to take a polygraph examination.

About 4 p.m. the police took defendant to the polygraph unit located in another building. After the test was completed, the polygraph examiner opined that defendant was not being truthful about his knowledge of or participation in the death of the victim.

Police returned defendant to an interview room, told him that he was under arrest, and advised him of his *Miranda* rights. About 11

p.m., defendant was placed in a lineup viewed by Alanda, the victim's daughter. Alanda was unable to identify anyone.

The following day, November 10, Detective Nowak reinterviewed Michael Banks, who stated that the night of the incident defendant was wearing black loafer dress shoes. The police took defendant's shoes, which he was wearing, and brought them to the crime lab. The serologist, Pam Fish, tested the shoes and found blood present on the right shoe and the instep area of the shoe; however, the amount of blood present was insufficient to perform further tests to determine whether the blood was animal or human.

About 4 p.m. Detective Nowak informed defendant that traces of blood had been discovered on his shoes and again advised defendant of his *Miranda* rights. Defendant again denied any involvement in the crime. The investigation was then turned over to two other detectives, Dennis Keane and Greg Baiocchi.

The evening of November 10, after informing defendant of his *Miranda* rights, Detectives Keane and Baiocchi questioned defendant, who denied knowledge of anything about the death of the victim. Defendant was told that his statements were inconsistent with the information given by Michael Banks. The police then allowed defendant to read Michael Banks' statements. After reading his uncle's statements, defendant gave a statement relating the events which led to the death of the victim.

In his statement, defendant said that he had gone to the victim's apartment during the afternoon of October 30, 1986, to use her telephone and ask if he could borrow some money. The victim told defendant to come back later. About 2:30 a.m. on October 31, defendant returned to the victim's apartment. The victim told defendant that "he would have to be with her or she would not give him any money." When defendant told her he could not comply, an argument began. When defendant walked to the apartment door, the victim came out of the kitchen with a butcher knife. Defendant grabbed the victim's wrists and threw her to the floor. When she landed on the floor, she somehow stabbed herself once. Defendant then picked up the knife and stabbed the victim five or six times. Defendant went into the bedroom, found the victim's purse and took about $100. While he was in the bedroom, he heard the window open. When he looked into the living room, defendant saw that the victim was gone. Defendant then went to the Bankses' apartment, told Michael Banks what had happened, and gave Banks $50 to buy cocaine to calm him down.

Defendant filed a motion to quash his arrest and suppress evidence and his statements. At the suppression hearing, defendant tes-

tified that on November 9, 1986, when the police entered his grandmother's house, they told defendant they wanted to ask him some more questions. Defendant also testified that he "went willingly" and was not handcuffed but thought he was under arrest at this time.

When they arrived at the police station, defendant testified that he was placed in the interview room, handcuffed to the wall, and denied permission to call his parents. After being questioned for about one hour, the police took his shoes and left. When the police returned, defendant was asked to take a lie detector test and he agreed.

After taking the lie detector test, defendant was again placed in the interview room and denied permission to call his father to get a lawyer. After defendant denied knowing anything, the police took his shoes, shirt, and jacket and left. When they returned, the police told defendant that blood had been found on defendant's clothing, accused him of committing the crime, and started punching him.

Defendant further testified that he was then put in a lineup and was told that the victim's daughter identified him. Defendant again asked to call his father and get a lawyer, but his requests were denied. Defendant testified that he was physically mistreated and verbally abused. Thereafter, defendant was taken from the interview room, formally charged and allowed to call his stepfather. During the phone conversation, defendant testified that Detective Nowak snatched the phone and threatened to "wrap the cord around [defendant's] neck" if he told his father that the police were trying to make him say anything.

After being charged, according to his testimony, defendant was taken to Cook County jail and examined by a doctor. Defendant did not tell the doctor that he had been injured or beaten by the police.

At some time on November 10, defendant saw his aunt, Delores Banks, for about five minutes in the interview room. His aunt provided defendant with cigarettes. About 30 minutes later, defendant gave his statement because he "was tired of [the police] hitting on" him. Defendant testified that prior to the arrival of the assistant State's Attorney to take his statement, he had not been advised of his *Miranda* rights. Defendant signed a document, after the assistant State's Attorney read it to him, stating that he had been well treated by the police.

Although his aunt testified that defendant told her he had been beaten and the police kicked his chair out from under him, defendant did not show her any area of his body where he had been beaten and she did not notice any marks on defendant.

Defendant also testified that he had not been given any food during his detention but was allowed to use rest room facilities whenever he wanted.

The police officers involved denied any improper conduct and testified that defendant was given food.

Following the suppression hearing, the trial court denied defendant's motions. Regarding defendant's motion to quash his arrest, the trial court first found that defendant was not under arrest when he was brought from his grandmother's house to the police station, stating that "the totality of the evidence is that he [defendant], in fact, went with those officers voluntarily and he was not under arrest at that point."

Next the trial court found that defendant was placed under arrest after the polygraph examination and that the facts and circumstances known to the police at that time established probable cause.

The trial court reasoned that the police knew or had a reasonable basis to believe that: (1) defendant knew the victim; (2) defendant was staying in the same apartment building; (3) defendant may not have been telling the truth in light of the inconsistencies in the statements made by defendant and other people; (4) defendant had come into some money in a very short period of time; (5) there were no signs of forced entry into the victim's apartment, indicating that someone who stayed in the building had been in the victim's apartment; and (6) defendant had an injury to his hand and stains of some type on his shoes on the date in question.

The trial court further found that defendant was advised of his *Miranda* rights on numerous occasions and that he freely and voluntarily made his statements to the police on the day after his arrest. The trial court believed that there was no evidence that defendant had been beaten, struck or injured in any way, and that the police officers' testimony denying striking defendant was corroborated by the testimony of Delores Banks, who observed no injury to defendant when she saw him on November 10, by the testimony of the assistant State's Attorney, who indicated that defendant was well when he saw him, and by defendant's statements to the assistant State's Attorney and the paramedics indicating that he had suffered no injuries.

In addition, the trial court found that defendant's will had not been improperly overcome by the actions of the police or by the treatment he received. The trial court stated that defendant was not continuously interrogated during his period of confinement, had access to the telephone and relatives, sustained no physical injury, and was not misled or tricked by the police. Moreover, the trial court explained

that defendant had placed his credibility in issue when he chose to testify and the court did not believe his testimony.

The jury found defendant not guilty of felony murder but convicted him of voluntary manslaughter and armed robbery.

Defendant first contests the time and legality of his arrest. He submits that the conduct of the police, his belief that he was under arrest, his transportation to the police station in a police vehicle with two officers, and the length and place of his detention are sufficient indicia of an arrest at his grandmother's home.

Considering the consensual entry into the premises and that defendant voluntarily accompanied the police to the station, the trial court found defendant was not placed under arrest until later that same day at the police station.

A trial court's finding as to the time of arrest cannot be disturbed unless it is manifestly erroneous. (*People v. Rimmer* (1985), 132 Ill. App. 3d 107, 476 N.E.2d 1278.) Moreover, a reviewing court will not substitute its judgment for that of the trial court in resolving conflicts in the evidence.

"An arrest occurs when the circumstances are such that a reasonable person, innocent of any crime, would conclude that he was not free to leave." (*In re D.G.* (1991), 144 Ill. 2d 404, 409, 581 N.E.2d 648.) Courts look to the totality of the circumstances surrounding the encounter to determine if an arrest occurred. *People v. Graham* (1991), 214 Ill. App. 3d 798, 809, 573 N.E.2d 1346.

"In Illinois, a valid arrest occurs when: police officers inform defendant of a violation; defendant submits to their control; and the evidence clearly shows that the officers *intended* to effect the arrest and defendant so *understood* them." (Emphasis in original.) *Rimmer*, 132 Ill. App. 3d at 111.

Factors to be considered in determining whether or not an arrest occurred include the presence or absence of a formal declaration of arrest and other routine procedures associated with an arrest, such as handcuffing, fingerprinting, and photographing. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 148, 463 N.E.2d 929.) The subjective understanding of the arrestee is not relevant to this analysis, but rather what a reasonable, innocent man should have thought under the circumstances. *Clay*, 124 Ill. App. 3d at 148.

To support his position that the arrest was effected at the time he left his grandmother's house, defendant incorrectly relies on *People v. Vega* (1990), 203 Ill. App. 3d 33, 560 N.E.2d 983. In *Vega*, the 16-year-old defendant had previously refused to comply with the police officers' repeated attempts to contact him; police required the defendant

to stand with his legs spread apart and searched him as they left his home; although refusing to take a lie detector test, he was forced to go to a crime laboratory for a polygraph test; and the police officers testified that they may have physically restrained the defendant if he had attempted to leave. The court also considered that no probable cause existed to justify the defendant's arrest. These are very different circumstances than those in the case before us.

"A citizen's assumption that he is required to cooperate with police should not be equated with an arrest." *Rimmer*, 132 Ill. App. 3d at 112; *People v. Johnson* (1989), 187 Ill. App. 3d 756, 544 N.E.2d 392.

In *Johnson*, the appearance of four policemen at the defendant's home, their request that he dress and accompany them to the police station, the observation by an officer while he dressed, no questions asked of the defendant at home, and no display of weapons or handcuffing did not constitute an arrest. *Johnson*, 187 Ill. App. 3d at 770.

Similarly, in *People v. Hunley* (1989), 189 Ill. App. 3d 24, 545 N.E.2d 188, no arrest occurred where a police officer testified that the defendant agreed to go to the police station for questioning, was not handcuffed or restrained in any way, and was not advised of his *Miranda* rights notwithstanding the defendant's contrary testimony that he was handcuffed in the apartment hallway and that he believed he had no choice but to go. *Hunley*, 189 Ill. App. 3d at 36.

■ We believe that the circumstances in *Johnson* and *Hunley* are similar to the situation in the present case. Thus, the trial court's finding that defendant was placed under arrest at the police station, rather than at his grandmother's house, is not manifestly erroneous given the consensual nature of the entry into her home, the lack of indicia of arrest, and defendant's testimony that he accompanied the police "willingly."

Defendant next asserts that even if the time of arrest is determined to be at the police station, his arrest was still illegal because the police improperly relied on polygraph results. Without the polygraph results, defendant argues, the police did not have probable cause to arrest him and, in any event, the results of the polygraph tests of defendant and Michael Banks should not have been admitted at the suppression hearing.

The State responds that defendant waived this issue by failing to state specifically in his motion for a new trial that the police improperly relied on the polygraph test. However, in any event, the police were aware of sufficient facts to reasonably believe that defendant

had committed the crime and did not improperly rely upon the results from the polygraph tests.

The State asserts that the polygraph tests were introduced at the suppression hearing to show that the motivation for defendant's decision to make a statement to police was other than police brutality.

Initially we find that defendant has not waived this issue. To preserve an issue for appeal, an objection must be made at trial and the issue must be included in a written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) The record reveals that defendant objected to the introduction of the polygraph test results at the suppression hearing and defendant's post-trial motion raised the issue of the trial court's denial of his motions to quash his arrest and suppress his statement, expressly encompassing his arguments on the motions.

The parties agree that the results of a polygraph test cannot be the basis for making a probable cause determination. *People v. Booker* (1991), 209 Ill. App. 3d 384, 394, 568 N.E.2d 211; *People v. Haymer* (1987), 154 Ill. App. 3d 760, 769, 506 N.E.2d 1378.

A probable cause determination, however, is governed by commonsense considerations and the totality of the facts and circumstances known to the police officers "such that a reasonably prudent person would believe that the suspect is committing or has committed a crime." (*People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475.) The calculation used to determine the existence of probable cause concerns the " 'probability of criminal activity,' " not " 'proof beyond a reasonable doubt.' " *Montgomery*, 112 Ill. 2d at 525, quoting *People v. Tisler* (1984), 103 Ill. 2d 226, 236, 469 N.E.2d 147.

A trial court's finding as to probable cause will not be disturbed unless it is shown to be manifestly erroneous. (*People v. Haymer* (1987), 154 Ill. App. 3d 760, 767, 506 N.E.2d 1378.) It is the function of the trial court to evaluate the credibility of witnesses and resolve conflicts in their testimony. *Rimmer*, 132 Ill. App. 3d at 112.

■ At the time of defendant's arrest, the police investigation had gleaned sufficient information to connect defendant to the crime: the lack of any signs of forced entry into the victim's apartment and the statement by the victim's daughter that her mother was attacked by a person who resided in the building indicated that the perpetrator knew the victim and lived in the same apartment building; defendant knew the victim, resided in the victim's apartment building and was present in the building during the entire night of the incident; defendant's effort to obtain money from Charlene Powell and his subsequent possession of cash as indicated by Michael Banks' statement that

defendant gave him $50 about 4 a.m.; Banks' observation that defendant had injured his hand and stained his shoes; and discrepancies contained in the statements of the Powells, Michael Banks, and defendant which suggested that defendant may not have been telling the truth to the police.

All of these facts and circumstances indicate the police had probable cause to arrest defendant without reliance upon the polygraph tests.

To the extent, if any, the trial court relied on the results of the polygraph examination in his probable cause determination, such reliance is error. However, since we have determined that sufficient information existed to establish probable cause, any consideration of the polygraph test by the trial court was harmless error.

██ Furthermore, we reject defendant's argument that the introduction of the results of the polygraph tests at the suppression hearing requires reversal. To support this proposition, defendant primarily relies on cases dealing with the inadmissibility of polygraph evidence at trial (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070), in a sentencing hearing (*People v. Szabo* (1983), 94 Ill. 2d 327, 447 N.E.2d 193), and in ruling on a post-trial motion which raised the sufficiency of the evidence (*People v. Yarbrough* (1982), 93 Ill. 2d 421, 444 N.E.2d 493). Unlike the cases relied on by defendant, the issue in the present case arose at a suppression hearing.

The suppression hearing addressed two motions by defendant: (1) a motion to quash his arrest and suppress evidence; and (2) a motion to suppress his statements. Although polygraph tests cannot be used to establish probable cause, they can be considered as a factor in determining whether a statement was given voluntarily. (*People v. Jackson* (1990), 198 Ill. App. 3d 831, 846, 556 N.E.2d 619 (the evidence showing that the defendant failed a polygraph examination was admissible for the limited purpose of showing that it was his failure to pass the test, rather than the alleged threats of violence by the police, which motivated the defendant to confess).) In *Jackson* the court found:

> "The underlying rationale for both *Baynes* and *Yarbrough* was the fear that the fact finder would consider the polygraph results as conclusive. Neither *Baynes* nor *Yarbrough* dealt with the admissibility of polygraph evidence for the limited purpose of determining the voluntariness of a confession." (*Jackson*, 198 Ill. App. 3d at 846.)

Moreover, a trial court, without a jury, is presumed to consider only competent evidence. (*People v. Padilla* (1988), 173 Ill. App. 3d 357,

361, 527 N.E.2d 700.) To overcome that presumption, the record must affirmatively show the contrary. *Padilla*, 173 Ill. App. 3d at 361.

Accordingly, we hold that the admission of the results of the polygraph examination in the dual purpose suppression hearing of the present case does not require reversal.

Defendant next argues that his statements to police should have been suppressed because they were (1) the result of an illegal arrest; (2) taken in disregard of his right to counsel; and (3) made involuntarily.

■ Our finding that defendant's arrest was valid obviates the need to consider defendant's first argument. *People v. Clay* (1973), 55 Ill. 2d 501, 506, 304 N.E.2d 280; *Rimmer*, 132 Ill. App. 3d at 115.

Second, defendant asserts that he requested an attorney at least twice prior to making his statements and that the police ignored his requests. Thus, defendant submits that his statements were illegally obtained because they were taken in disregard of his right to counsel.

It is well established that when an individual requests an attorney, all interrogation must cease until an attorney is present. (*Miranda v. Arizona* (1966), 384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28.) The State bears the burden of proving that a defendant knowingly waived his *Miranda* rights, but proof beyond a reasonable doubt of waiver is not required. (*People v. Rogers* (1988), 123 Ill. 2d 487, 495, 528 N.E.2d 667.) After observing the witnesses testify at a suppression hearing, a trial court is entitled to disbelieve the defendant's version of what transpired. *People v. Gacho* (1988), 122 Ill. 2d 221, 238, 522 N.E.2d 1146.

Defendant's own testimony at the suppression hearing was the only evidence presented to indicate that defendant invoked his right to counsel before making any inculpatory statements. Although defendant acknowledged that before giving his oral statement to the police and his written statement to the assistant State's Attorney he had talked to his stepfather on the telephone and had visited with his aunt in person, neither relative substantiated defendant's claim that he had requested a lawyer.

The testimony of the police officers and the assistant State's Attorney contradicted defendant's testimony on this issue. The trial court specifically found that defendant's testimony was not believable and that he had received his *Miranda* warnings on several occasions prior to giving his oral and written statements.

In light of the evidence adduced at the suppression hearing and the presumption afforded the trial court's ruling, we find that defend-

ant's statements were not taken in disregard of an invocation for counsel.

Defendant next asserts that his statements were made involuntarily and thus should have been suppressed.

A confession is voluntary when found to have been made freely and without compulsion and if the defendant's will was not overcome at the time he confessed so as not to be the product of rational intellect and free will. (*People v. Perez* (1992), 225 Ill. App. 3d 54, 66, 587 N.E.2d 501.) In determining the voluntariness of the statements, courts must consider the totality of the circumstances (*Perez*, 225 Ill. App. 3d at 66), including both the characteristics of the accused and the details of the interrogation (*Hunley*, 189 Ill. App. 3d at 38). The burden is on the State to establish by a preponderance of the evidence that a confession is voluntary. *Perez*, 225 Ill. App. 3d at 65.

A reviewing court will not disturb a finding on the issue of whether a confession is voluntary unless it is contrary to the manifest weight of the evidence and may consider the evidence presented at the suppression hearing and at trial. *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223; *Perez*, 225 Ill. App. 3d at 66.

We hold that the trial court's finding of voluntariness is not against the manifest weight of the evidence. The record reveals that defendant was an adult with no indication of limited mental capacity. As previously discussed, defendant was not illegally detained and his allegations of physical and verbal abuse were refuted by other testimony, by the written statement signed by defendant that he had been treated well and not threatened, by the stipulated testimony of a hospital employee who stated that defendant told him during a physical examination on November 11 at Cook County jail that he was in good health and had no injuries, and by the lack of physical evidence of injury. Moreover, the evidence reveals that defendant was advised of his *Miranda* rights on several occasions prior to making any inculpatory statements. Furthermore, detention in an interview room which lacks "comfortable furnishings fails to indicate the existence of a coercive element in the circumstances surrounding the confessions." (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 402, 495 N.E.2d 984.) The evidence presented also revealed that defendant was fed, notwithstanding defendant's testimony to the contrary.

Defendant also argues that his statements were coerced because he was not brought before a judge for a preliminary hearing between the time of his arrest and his statements. Since defendant did not raise this issue in his motion to suppress, the trial court did not consider this factor and the issue is waived on review. Even if we were

to consider this factor, it would not suggest a different result since unnecessary delay is only one of the myriad factors to be considered and unnecessary delay "will not render a confession *per se* invalid." *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 1012, 501 N.E.2d 207.

The totality of the circumstances in the present case supports the trial court's finding that defendant's statements were voluntarily made.

In the third issue raised on appeal, defendant asserts that the trial court's refusal to "life qualify" the jury constituted reversible error because his right to an impartial jury was violated. Defendant argues that his jury was biased toward the prosecution because the trial court "death qualified," but did not "life qualify," the jury. Defendant urges this court to follow cases from other States, *Stanford v. Commonwealth* (Ky. 1987), 734 S.W.2d 781, and *Patterson v. Commonwealth* (1981), 222 Va. 653, 283 S.E.2d 212.

At the time of trial, the Illinois Supreme Court had repeatedly held that a trial court is not required to "life qualify" a jury. (*People v. Jackson* (1991), 145 Ill. 2d 43, 582 N.E.2d 125; *People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402; *cf. Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (death-qualifying questions are appropriate).) Accordingly, the trial court's refusal to pose life-qualifying questions to the prospective jurors did not violate the constitutional requirements of due process at that time.

However, in a case originating in Illinois, the United States Supreme Court has recently held that a trial court's refusal to "life qualify" potential jurors in a capital case when requested to do so is inconsistent with the due process clause of the fourteenth amendment. (*Morgan v. Illinois* (1992), 504 U.S. ___, 119 L. Ed. 2d 492, 112 S. Ct. 2222.) In *Morgan* the Court reversed the death sentence imposed on the defendant who had been convicted of first-degree murder and remanded for a new sentencing hearing. It is evident from the *Morgan* decision that life-qualifying questions, when requested, will now be required in cases involving capital offenses.

Unlike *Morgan*, the present case involves a defendant who, although charged with a capital crime, was convicted of voluntary manslaughter, not murder, and sentenced to a prison term, not death. Moreover, the present defendant was sentenced by a judge, not a jury. Although a "reverse *Witherspoon*" or "*Morgan*" inquiry would have been appropriate at *voir dire*, the jury's verdict of manslaughter makes such inquiry moot.

The fourth issue raised by defendant is whether the trial court erred in admitting evidence of the blood spot on defendant's shoes and the results of the tests performed on the blood spot. The test results showed that blood was present on the instep area of defendant's right shoe but the amount of blood was insufficient to perform any further tests. Thus, the blood type could not be established and no determination was made as to whether it was human or animal blood.

Defendant asserts that the admission of the blood spot on his shoe and the subsequent test results constitutes reversible error because the State failed to establish a nexus between the blood spot and either defendant, the victim or the crime.

The State contends that the evidence was properly connected to both defendant and the crime. Alternatively, the State maintains that the admission of this evidence, even if improper, did not prejudice defendant since (1) the jury was aware the blood was not conclusively determined to be human and thus could have attached little weight to this evidence; and (2) the other evidence against defendant was strong.

"The general rule is that physical evidence may be admitted provided there is proof to connect it with the defendant and the crime." (*People v. Free* (1983), 94 Ill. 2d 378, 415, 447 N.E.2d 218.) Proof of the connection between the defendant and the crime may be circumstantial and relevance is the basic question in determining the sufficiency of the nexus. *People v. Valentino* (1985), 131 Ill. App. 3d 257, 260, 475 N.E.2d 627.

"[R]elevant evidence means evidence having any tendency to make the existence of any material fact more probable or less probable than it would be without the evidence." *Free*, 94 Ill. 2d at 415.

■ We believe that a sufficient connection was established such that the trial court did not abuse its discretion in admitting defendant's shoes and the results of the tests performed on the stain found on one of the shoes. The shoes clearly were sufficiently connected to defendant since he was wearing them at the time they were confiscated by the police. The statement and testimony of Michael Banks established the type of shoes, *i.e.*, black loafers, worn by defendant and that the stains on the shoes were present when he saw defendant shortly after the victim was killed. Although Banks could not positively identify the shoes at trial, he testified the shoes admitted into evidence appeared to be the ones defendant was wearing on the morning of the incident and were similar to the shoes which were bloodstained. Moreover, the victim's apartment was splattered with

blood when inspected by the police. The tests determined that the stain on the shoe was blood even though the analysis could not substantiate whether the blood was human or animal. The inconclusiveness of the tests and Banks' testimony only impact the weight, not the admissibility of the evidence.

The cases relied upon by defendant are distinguishable. (*City of Chicago v. Brown* (1978), 61 Ill. App. 3d 266, 377 N.E.2d 1031; *People v. Rogers* (1976), 42 Ill. App. 3d 499, 356 N.E.2d 413.) In *Brown*, the defendant, who was convicted of resisting a police officer while attempting to enter a theater for a music concert without a ticket, sought to introduce into evidence her allegedly bloodstained jacket to support her claim that a police officer struck her in the nose contrary to the officer's testimony which maintained that the defendant caused her nose to bleed at the precinct house and refused to accept first aid. The *Brown* court found that the exclusion of the jacket was proper because the defendant offered no proof that the blood appeared on her coat on the night of the incident and an inspection of the coat did not reveal any bloodstains on the jacket. In contrast, the present case includes evidence that Michael Banks saw the stains on defendant's shoes on the morning of the incident and the tests revealed that the stains on the shoes were blood.

In *Rogers*, the court found that the admission of a sheet and the victim's shorts and undershirt, all stained with blood, was error because no evidence was introduced to establish that the victim was wearing the items of clothing at the time of the incident nor was any connection whatsoever made to the sheet. Moreover, the State failed to present any testimony regarding the results of the analysis of these items. Most importantly, the prosecutor in *Rogers* repeatedly and improperly made statements regarding these items which were not based upon the evidence admitted at trial. Unlike *Rogers*, the present case includes evidence establishing that the blood was seen on defendant's shoes shortly after the victim was killed, the shoes were confiscated directly from defendant, a serologist testified as to the results of the tests performed on the shoes, and no allegation exists that the prosecutor made improper arguments regarding the shoes.

A logical inference can support the admission of physical evidence and we believe that under the circumstances of this case, a logical inference was drawn that defendant, the bloodstains, and the shoes were connected to the death of the victim. *People v. Fletcher* (1978), 66 Ill. App. 3d 502, 515, 383 N.E.2d 1285.

Defendant next contends that the evidence entitled him to an instruction on the offense of theft and that the trial court erred in refusing to give such a tendered instruction. We disagree.

Defendant was indicted for the offenses of murder and armed robbery. Defendant requested and received a jury instruction on voluntary manslaughter, which is a lesser included offense of murder.

■ An accused generally "cannot be convicted of an offense that was not charged unless the offense of which he is found guilty is a lesser included offense of the one charged." (*People v. Schmidt* (1988), 126 Ill. 2d 179, 183, 533 N.E.2d 898.) This court specifically held that theft is not a lesser included offense of armed robbery. *People v. Trotter* (1988), 178 Ill. App. 3d 292, 299, 533 N.E.2d 94; *cf. People v. Rivers* (1990), 194 Ill. App. 3d 193, 550 N.E.2d 1179 (discusses the split of authority in Illinois on this issue and distinguishes *Trotter*).

In *Trotter*, this court found that the "two crimes [armed robbery and theft] are distinct. (*People v. McCarty* (1983), 94 Ill. 2d 28, 445 N.E.2d 298.) Theft requires only an intended, unauthorized deprivation of property, while robbery requires the use of force, regardless of intent. [Citation.] Since theft is not a lessor [*sic*] included offense of armed robbery, a defendant charged with armed robbery is not entitled to a theft instruction." *Trotter*, 178 Ill. App. 3d at 299.

"[W]here some of the elements of the crime charged themselves constitute a lesser crime, the defendant, if the evidence justifies it, is entitled to an instruction which would permit a finding of guilt of the lesser offense." (*People v. Sanders* (1988), 168 Ill. App. 3d 295, 305, 522 N.E.2d 715; accord *People v. Roberts* (1989), 189 Ill. App. 3d 66, 72, 544 N.E.2d 1340 ("a defendant is entitled, *under certain circumstances*, to have the jury instructed as to an offense less serious than that with which the defendant is charged") (emphasis in original).) Both *Sanders* and *Roberts* held that the trial court's refusal to instruct on the lesser offenses requested did not constitute error.

Nonetheless, where "the evidence is sufficient for a conviction on the greater offense, it is not reversible error to instruct only as to that offense." (*People v. Fonville* (1987), 158 Ill. App. 3d 676, 685, 511 N.E.2d 1255.) Even if an instruction on a lesser offense might have been given, "the failure to give an otherwise appropriate jury instruction requires reversal only when the defendant was so prejudiced by that failure as to affect the outcome of the verdict." *Fonville*, 158 Ill. App. 3d at 687-88.

We believe that no such prejudice is present in the instant case.

Defendant next asserts that the jury verdicts which acquitted him of murder and convicted him of voluntary manslaughter and armed robbery are legally and logically inconsistent.

"Legally inconsistent verdicts are verdicts where the same essential element of each crime is found to exist and not to exist and both crimes arise out of the same set of facts. [Citations.] Legally inconsistent verdicts are invalid and the convictions must be reversed. [Citation.] However, a jury may acquit a defendant on one or more counts on a multicount indictment in the belief that the count on which it convicted the defendant will provide sufficient punishment." *People v. Sandy* (1989), 188 Ill. App. 3d 833, 845, 544 N.E.2d 1248 (acquittal on first degree murder and conviction on felony murder based on aggravated battery were not legally inconsistent in a case involving the death of a child); see *People v. Bridges* (1989), 188 Ill. App. 3d 155, 157-58, 544 N.E.2d 40 (acquittal of murder and conviction of voluntary manslaughter were not inconsistent "because together they implicitly show that the jury rejected the theory that defendant intended to kill [the victim], and instead found that defendant had an unreasonable belief in the need to defend himself").

■ Accordingly, we find that the jury verdicts in this case are not legally inconsistent.

This court explained logically inconsistent verdicts as follows:

"Logical inconsistency between verdicts involves the acceptance and rejection of the same theory of the case for the State or the defense, and may exist between a conviction of one crime and an acquittal of another, where both arise out of the same facts but have different essential elements. [Citation.] If logically inconsistent verdicts cannot be construed otherwise, their inconsistency is a factor contributing to the existence of a reasonable doubt of guilt to be considered upon review of a contention that a defendant was not proven guilty beyond a reasonable doubt. However, verdicts that are only logically inconsistent do not *per se* require a reversal since it may be determined upon review that there was, nonetheless, sufficient evidence to support the defendant's conviction." (*People v. Cobbins* (1987), 162 Ill. App. 3d 1010, 1024, 516 N.E.2d 382.)

Moreover, this court noted that "[i]t is well established that the jury's historic power of lenity prevails over traditional doctrine concerning inconsistent verdicts." *Cobbins*, 162 Ill. App. 3d at 1025.

In light of these principles, we find that any logical inconsistency which may be deciphered from the jury verdicts in this case does not mandate reversal.

Defendant next asserts that there was insufficient evidence to support an armed robbery conviction because the State failed to prove beyond a reasonable doubt that the force used by defendant was used for the purpose of depriving the victim of money.

In reviewing the sufficiency of evidence to support a criminal conviction, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.

■ At trial the jury heard not only defendant's confession to the police and the assistant State's Attorney, but also heard the testimony of Michael Banks, who stated that defendant had planned the robbery of the victim and had confessed to Banks after the crimes were committed. From our examination of the record, in the light most favorable to the prosecution, we believe that a rational jury could find defendant guilty of voluntary manslaughter and armed robbery.

Finally, defendant contends that the trial court abused its discretion in sentencing him to an extended term of 60 years for armed robbery and an extended term of 30 years for voluntary manslaughter. Defendant argues that the statutory criteria for an extended-term sentence were not satisfied and that the trial court erred in considering the death of the victim and failed to consider the mitigating factors.

A reviewing court may not alter a sentencing decision absent an abuse of discretion by the trial court and may not substitute its judgment for that of the trial court merely because it would have balanced the appropriate factors differently. *People v. Cox* (1980), 82 Ill. 2d 268, 279-80, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

Aggravating factors authorized by statute which a court may consider include whether or not the defendant's conduct caused serious harm and the sentence is necessary to deter others from committing the same act. Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.2(a)(1), (a)(7).

In applying the statutory aggravating factor that the defendant's conduct caused serious harm, a trial court may consider "the force employed and the physical manner in which the victim's death was brought about" in sentencing a defendant on a conviction for voluntary manslaughter. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 271-72, 497 N.E.2d 1138.) However, it is improper to consider the death of

the victim where the death is implicit in the offense like voluntary manslaughter. *Saldivar*, 113 Ill. 2d at 271-72.

At sentencing in the present case, the trial court stated:

> "In aggravation and mitigation, *we consider and are considering* whether—or may consider whether an individual's actions caused serious harm. Well, in your case, Mr. McClellan, the jury found *that your actions caused the ultimate harm, that being death.*
>
> We may also consider and do consider in this case whether the sentence is necessary to deter others from committing the same or similar crimes." (Emphasis added.)

The trial court made no mention of the amount of force used or the manner in which the defendant killed the victim.

■■■ We recognize that "it is unrealistic to suggest that the judge in sentencing the defendant must avoid mentioning the fact that someone has died or risk committing reversible error." (*People v. Green* (1991), 209 Ill. App. 3d 233, 248, 568 N.E.2d 92, citing *People v. Martin* (1983), 112 Ill. App. 3d 486, 445 N.E.2d 795.) However, where the trial court expressly states that it was considering the death of the victim, the court errs. *Green*, 209 Ill. App. 3d at 248.

In *Green*, this court found that the trial court erred by improperly considering the death of the victim when it stated, during sentencing, " 'I am taking into consideration how your conduct caused serious harm, it caused serious harm, the worst possible loss to the victim of the murder, her life was taken.' " *Green*, 209 Ill. App. 3d at 248.

Similarly, this court found that the trial court improperly considered the death of the victim when it stated that " 'the defendant's conduct caused serious harm. The most serious fatality. That is a factor in aggravation which the Court must consider in imposing a more severe sentence.' " (*People v. Moore* (1988), 178 Ill. App. 3d 531, 544, 533 N.E.2d 463.) In *Moore*, the court found that the comment "[t]he most serious fatality" revealed that the trial judge had improperly focused on the victim's death rather than the manner in which the defendant killed the victim and the amount of force used. *Moore*, 178 Ill. App. 3d at 544.

The Illinois Supreme Court concluded that the trial judge improperly considered the victim's death as an aggravating factor in sentencing the defendant where the trial judge stated " 'in committing the felony [involuntary manslaughter] the defendant inflicted serious bodily injury to another resulting in death.' " *People v. Martin* (1988), 119 Ill. 2d 453, 461, 519 N.E.2d 884.

We believe that the comments made by the trial court at sentencing in the present case are so analogous to the remarks made in *Green, Moore* and *Martin* as to be indistinguishable. Thus, we find that the trial court erred by improperly considering the death of the victim in sentencing.

Notwithstanding the error, resentencing is not required where any consideration given to the improper factor was insignificant and where the court did not rely on this factor alone in sentencing the defendant. (*Green*, 209 Ill. App. 3d at 248; *Moore*, 178 Ill. App. 3d at 544.) The *Moore* court affirmed the sentence of 40 years' imprisonment for murder and the *Green* court upheld the extended-term sentence of 60 years' imprisonment for murder.

From our review of the total sentencing hearing, we find that the trial court gave minimal weight to the improper aggravating factor and appropriately considered other proper factors, including deterrence, rehabilitation, protection of society, and the brutal nature of the offense.

■■ Moreover, an extended-term sentence may be imposed "[w]hen a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).) Defendant was convicted of two felonies, voluntary manslaughter and armed robbery. The trial court found that the circumstances of this case, including the infliction of multiple stab wounds and the trauma to the various parts of the victim's body, evidenced brutal and heinous conduct on the part of defendant. Given the facts of this case, we cannot say that the trial court abused its discretion in imposing an extended-term sentence.

■■ We also reject defendant's argument that the trial court failed to consider mitigating factors. "[W]here mitigation evidence is before the court, it is presumed that the sentencing judge considered the evidence, absent some indication, other than the sentence imposed, to the contrary." *People v. Bergman* (1984), 121 Ill. App. 3d 100, 109, 458 N.E.2d 1370.

■■ Defendant correctly asserts, and the State agrees, that the extended-term sentence for voluntary manslaughter should be reduced because he was also sentenced to an extended term for armed robbery.

"[W]hen a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class and only if that offense was accompanied by brutal and heinous behavior." (*People v. Jordan*

(1984), 103 Ill. 2d 192, 206, 469 N.E.2d 569, 575.) Voluntary manslaughter (Class 1 felony) is a less serious offense than armed robbery (Class X felony).

Accordingly, as authorized by Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)), we reduce defendant's sentence for voluntary manslaughter to 15 years, the maximum term available for a Class 1 felony (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(4)), to run concurrently with defendant's sentence for armed robbery.

Judgment affirmed in part; modified in part.

RIZZI and CERDA, JJ., concur.